UMC ELECTRONICS CO., Plaintiff,

v.

UNITED STATES, Defendant.

Nos. 93–709C, 95–450C.

United States Court of Federal Claims.

June 23, 1999.

Alan M. Lestz, Witte & Lestz, Bronxville, New York, Attorney of Record, Michael J. Hogan and James S. Phillips, Arlington, Virginia of counsel, for plaintiff.

Judith Rabinowitz, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Robert M. Hollis, Assistant Director, David M. Cohen, Director, Michael F. Hertz, Director, and Richard I. McKay, Attorneys of Record, Major Rebecca Pearson, Department of the Air Force, Contract Litigation Division, Arlington, Virginia, of counsel, for defendant.

## OPINION

HORN, Judge.

The case comes before the court following a contracting officer's final decision, denying plaintiff's claim for an equitable adjustment under a contract for the production of floodlight sets for the United States Department of the Air Force. The plaintiff also asserted an adversary claim against the United States

in the United States Bankruptcy Court for the District of Connecticut. The Bankruptcy Court dismissed the adversary proceeding without prejudice and ordered the plaintiff and the United States to refile their pleadings in the United States Court of Federal Claims.

The plaintiff, therefore, filed a first complaint in this court, Case No. 93–709C, appealing the contracting officer's final decision and seeking an additional claim for labor costs. The court dismissed the plaintiff's labor cost claims based upon a failure to submit the claim to the contracting officer. Following a contracting officer's denial of the labor cost claims, plaintiff filed an additional complaint in this court, Case No. 95–450C. These two complaints were subsequently consolidated.

On August 28, 1995, the United States moved for leave to file counterclaims under the Special Plea in Fraud, 28 U.S.C. § 2514 (1994), the False Claims Act, 31 U.S.C. § 3729 (1994), and the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604 (1994). This motion was granted at a status conference on October 26, 1995. A trial on the government's fraud counterclaims was conducted prior to action on the plaintiff's claim because, if the government were to be successful, the plaintiff's claim would be foreclosed. Closing arguments were conducted on March 2, 1999, after which the parties sought leave to file additional pleadings.

## FACTS

Prior to September 1986, the Air Force had prepared an "Acquisition Plan" to procure portable floodlight sets, termed the "NF–2D," to replace its fleet of "NF–2" Floodlight Sets, which are used throughout the world to provide lighting for nighttime maintenance, loading and unloading, security, and emergency lighting of Air Force aircraft. The Acquisition Plan recommended the procurement of the NF–2D Floodlight Sets because the Air Force considered this to be the best alternative to replace the aging NF–2 Floodlight Sets which had exceeded their normal service life. In September 1986, the Air Force issued Request for Proposals to obtain a fixed price contract from a small business concern for the acquisition of "a best estimated quantity" of 7,350 NF–2D Floodlight Sets.

On April 29, 1988, the Air Force awarded Contract No. F41608–88–D–1680[1] to UMC Electronics Company (UMC), a small business concern which was engaged in the manufacture and supply of equipment for a variety of customers including the United States. UMC is a debtor in possession under the supervision of the United States Bankruptcy Court, District of Connecticut, Case No. 92–53869, and the plaintiff and counterclaim defendant in this proceeding. UMC's primary place of business is North Haven, Connecticut.

Under the terms of the contract, the ordering period commenced on the effective date of the contract, April 29, 1988, and expired five years after award date, on April 28, 1993. The contract required UMC to build NF–2D Floodlight Sets in accordance with the Scope of the Purchase Description, as amended, which "covers a basic NF–2 modified to include 3 KW Diesel Engine Driven (DED) generator set, modified version of the DOD generator set, MEP–016B, and two 1,000 watt high pressure sodium lights." In addition, the contract required that UMC initially produce a first article floodlight unit that would be subject to design review and testing.

The contract contains, in Part II, Contract Clauses, the standard "Disputes" clause from the Federal Acquisition Regulations (FAR), 48 C.F.R. § 52.233–1 (APR 1984), which prescribes the procedure for a contractor seeking an equitable adjustment. This clause, FAR 52.233–1, states:

> (a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. [§§ ] 601–613) (the Act).

---

1. The parties have stipulated that the government was represented, at all times pertinent, by its duly authorized contracting officers employed by either the United States Air Force San Antonio Air Logistics Center, Kelly Air Force Base, Texas (the Procuring Contracting Officer), the Defense Contract Management Area Office (DCMAO) located at Hartford, Connecticut, and/or their respective authorized representatives.

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $50,000 is not a claim under the Act until certified as required by subparagraph (d)(2) below. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(d)(1) A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

(2) For Contractor claims exceeding $50,000, the Contractor shall submit with the claim a certification that—

(i) The claim is made in good faith;

(ii) Supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and

(iii) The amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

(3)(i) If the Contractor is an individual, the certification shall be executed by that individual.

(ii) If the Contractor is not an individual, the certification shall be executed by—

(A) A senior company official in charge at the Contractor's plant or location involved; or

(B) An officer or general partner of the Contractor having overall responsibility for the conduct of the Contractor's affairs.

\* \* \* \* \* \*

(h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

48 C.F.R. § 52.233–1 (1987). Pursuant to FAR 52.233–1 and the contract, any equitable adjustment claim submitted by UMC prior to October 13, 1994 in excess of $50,000.00 had to be certified.[2]

UMC was cleared to begin general production of deliverable units after Air Force approval of the first article test unit on April 3, 1990. At the time of award and subsequent to the award of the contract, the Air Force issued delivery orders for the NF–2D Floodlight Sets as follows:

| Order No. | Date Issued | Quantity Ordered | Value of Order as Issued |
|---|---|---|---|
| 1 | April 29, 1988 | 2,061 | $10,848,593.00 |
| 3 3 | June 13, 1988 | 367 | $ 1,965,936.00 |
| 4 | December 28, 1988 | 27 | $ 206,762.00 |
| 5 | January 5, 1989 | 2 | $ 17,478.00 |
| 6 | May 15, 1990 | 27 | $ 227,416.00 |
| 7 | January 15, 1991 | 3 | $ 30,647.00 |

On or about April 2, 1992, the contracting officer suspended acceptance and inspection of units under the contract. As of the date of the contracting officer's action suspending

---

**2.** As of October 13, 1994, the threshold amount for certifications applies to claims in excess of $100,000.00, pursuant to 41 U.S.C. § 605(c)(1) (1994 & Supp. II 1997), as amended by Pub.L. No. 103–355, Title II, § 2351(b), (e)(1), (2), 108 Stat. 3322.

**3.** Order No. 2 was inadvertently omitted and not issued due to a numbering error.

the inspection and acceptance of units, UMC had delivered 2,343 production units. UMC's last delivery before the contracting officer's suspension of inspection and acceptance of units occurred in March 1992.

On May 10, 1990, UMC submitted the first of several versions of a certified claim for equitable adjustment pursuant to the "Disputes" clause, FAR 52.233–1, of the contract under which it had manufactured the NF–2D Floodlight Sets for the Air Force. UMC contended in the claim that it had suffered increased costs to perform the contract due to government-caused delay. An updated claim seeking equitable adjustment was submitted to the contracting officer on September 27, 1990. On June 11, 1992, UMC resubmitted its updated claim to the contracting officer seeking an equitable adjustment to the contract price in the amount of $3,824,-638.00, including interest to that date, for the 2,487 production units ordered to that date under the contract. In a final decision dated November 19, 1992, the contracting officer denied UMC's June 11, 1992 revised equitable adjustment claim in its entirety.

In the instant lawsuit, UMC attempts to appeal the denial of its June 11, 1992 version of the equitable adjustment claim and to reassert its entitlement to the amounts contained in that claim. As noted above, pursuant to the "Disputes" clause, FAR 52.233–1, incorporated into the contract, any equitable adjustment claim submitted by UMC in excess of $50,000.00 had to be certified. Each of UMC's claims for an equitable adjustment upon submission to the contracting officer contained a signed certification stating that the claim was:

made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the Contractor believes the government is liable.

Mr. Albert Devejian, UMC's controller and treasurer from 1988 on, certified each claim submitted by UMC. On the June 11, 1992 claim, in addition to Mr. Devejian, Mr. E. William Bishop, UMC's president, also certified, reviewed and approved the claim submission.

As UMC's chief financial officer, Mr. Devejian had ultimate responsibility for all financial matters within the company. Mr. Devejian maintained responsibility for UMC's accounting department and its books and records, and he prepared the financial statements that were provided to UMC's public accountants for review and filing with the Securities and Exchange Commission. As part of his duties, Mr. Devejian, was responsible for the preparation of the financial and cost information, schedules and data contained in or referenced in UMC's claims submitted to the contracting officer.

Prior to joining UMC in 1988, Mr. Devejian had considerable government contracting experience. During that time, Mr. Devejian participated in several submissions of claims to the government, including claims for equitable adjustment that contained an element of increased material costs. As a result of his multiple experiences preparing government contract claims, Mr. Devejian became familiar with the governing provisions of the FAR, particularly FAR 15.801,[4] which defines cost or pricing data, and FAR 15.804–6(b),[5] which sets forth the procedural re-

---

4. Cost or pricing data is defined in 48 C.F.R. § 15.801 (1987):

all facts as of the time of price agreement that prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are factual, not judgmental, and are therefore verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to

the validity of determinations of costs already incurred.

5. The relevant portions of 48 C.F.R. § 15.804–6(b) (1987) state:

(1) Cost or pricing data shall be submitted on Standard Form 1411 (SF 1411), Contract Pricing Proposal Cover Sheet....

(2) Contract pricing proposals submitted on SF 1411 with supporting attachments shall be prepared to satisfy the instructions and appropriate format of Table 15–2.

The instructions for Table 15–2 regarding cost pricing data states:

quirements for submitting cost or pricing data and the format for such pricing proposals.[6] During the trial, Mr. Devejian stated that he was required to familiarize himself with the FAR during his prior employment and while employed by UMC. This also is apparent in the fact that Mr. Devejian cited FAR 15.804–6 to vendors who sought price adjustments from UMC. Mr. Devejian also provided UMC's bankruptcy counsel with the cost information and schedules that were incorporated into the bankruptcy court submissions.

UMC's first claim submitted to the contracting officer was dated May 10, 1990. This claim alleged that the government had delayed the contract by failing to timely approve and incorporate government directed changes into the contract and by requiring engineering change proposals, resulting in a delay of 126 days and damages of almost $2,000,000.00, minus credits due the government. The submission included a cover letter outlining the basis for the claim, and that the claim was submitted "[p]ursuant to Contract FAR Clauses 52.243–1 Changes—Fixed Price and 52.212–15 Government Delay of Work, and the Contract Disputes Act of 1978, FAR 52.233–1." UMC's controller, Mr. Devejian certified the May 10, 1990 claim as in accord with the terms of the contract and the requirements of the Contract Disputes Act. At trial, Mr. Devejian acknowledged that he took the certification "very seriously," and "understood that this was a certification to the contracting officer that he would rely upon," and that he had "thoroughly reviewed this claim before signing this submission."

The May 10, 1990 claim submission to the contracting officer enclosed a claim schedule and eight exhibits which identified the basis of UMC's calculation of the equitable adjustment claims UMC alleges were caused by government delay. The cover letter to UMC's May 10, 1990 claim submission to the contracting officer discussed the basis for UMC's claim and advised the contracting officer that "[t]he amount of this claim reflects actual costs incurred during the First Article Design and Fabrication period, whereas those delay costs which will impact future periods of performance are projections which are based on our current business forecasts." The parties have stipulated that, at his deposition, Mr. Devejian reconfirmed the accuracy of the statement quoted immediately above. Exhibit E to UMC's May 10, 1990 claim submission, entitled "Increased Cost of Direct Materials Due to Delay," advised the contracting officer that this portion of UMC's claim was quantified through the application of a material escalation factor derived from the Producer Price Index for "Motors, Generators and Motor Generator Sets," which was the index called out in paragraph H–901 of the NF–2D Floodlight Sets contract.

At the time the May 10, 1990 claim was submitted, UMC had not begun general production under the contract and, therefore, according to Mr. Devejian, UMC "did not know what our actual costs were or are." Accordingly, UMC distinguished in its claim between its actual costs incurred for work already completed on the first article and its projected costs for general production work to be done in the future. UMC based its demand for increased material costs for production units in its May 10, 1990 claim on projected costs by determining an estimated unit price for each part, and then applying an escalation factor based on the Producer Price Index for motors, generators, and motor generator sets. However, UMC possessed actual material cost data for the first article units and, accordingly, UMC determined its actual costs incurred for the first article units by reference to its invoiced costs for those units.[7]

---

2. As part of the specific information required, the offeror must submit with offeror's proposal, and clearly identify as such, cost or pricing data (that is, data that are verifiable and factual and otherwise as defined at FAR 15.801).
48 C.F.R. § 15.804–6 (Table 15–2).

6. The court notes that in the record before the court, including testimony, exhibits, argument

and pleadings, both parties used the terms "cost or pricing data" and "cost and pricing data" interchangeably, despite the fact that the FAR uses the term "cost or pricing data." (emphasis added).

7. At trial, Mr. Devejian testified about the amount of the direct material costs claimed in

On September 27, 1990, apparently in response to government questions regarding its May 10, 1990 claim submission and in order to adjust for alleged government-caused delays experienced after the submission of the May 10, 1990 claim, UMC resubmitted its claim to the contracting officer in the increased amount of $2,640,802.00. Between the time of the May 10, 1990 claim and the September 27, 1990 claim, UMC had begun general production under the contract. Consistent with the commencement of production, the September 27, 1990 claim states that:

> 3. Actual costs, rather than estimated costs, are reflected in Exhibit D for the months of April 1990 to August 1990 for the purposes of calculating the daily unabsorbed fixed burden [8] during the originally scheduled production period.
>
> \* \* \* \* \* \*
>
> 6. A new Contract Disputes Act certification is enclosed for the revised claim.

UMC's September 27, 1990 claim submitted to the contracting officer consisted of a comprehensive letter prepared by UMC's counsel stating the legal and factual basis for UMC's claim, the supporting exhibits referenced in the letter by UMC's counsel in support of UMC's contention of government caused delay, a Standard Form 1411 Contracting Pricing Proposal Cover Sheet signed by Mr. Devejian, and an updated and modified quantum claims presentation dated September 26, 1990, with attachments, also prepared by Mr. Devejian. The purpose of this submission, as stated in the letter prepared by UMC's counsel, was to respond to comments and questions contained in a letter by the contracting officer dated July 19, 1990, in response to UMC's May 10, 1990 claim. The September 27, 1990 claim again advised the contracting officer that UMC's claim for increased direct material costs was based on the net increase of the Producer Price Index during the delay period. The portion of UMC's September 27, 1990 claim pertaining to the increased cost of direct materials due to delay consisted of the same Exhibit E, entitled "Increased Cost of Direct Materials Due to Delay," (with the date May 10, 1990 in the top right corner of the page) that had been forwarded to the contracting officer with UMC's May 10, 1990 claim submission.

A schedule, which was a September 21, 1990 revision of an earlier claim schedule, was attached in support of the September 27, 1990 claim, and referenced by Mr. Devejian as cost or pricing data impacted by alleged government delay. The revised schedule distinguishes between the periods for which UMC had actual cost data and those for which UMC had projected its material costs. This schedule contains the headings of "Actual" for the period when UMC had actual cost data, and "Projected" for the period of projected costs. Mr. Devejian explained that "I was distinguishing between past costs, historical costs, as opposed to those costs which remain to be incurred over the balance of the program." The "past costs" referred to by Mr. Devejian were the actual invoiced costs found on UMC's job cost ledgers.

On June 11, 1992, Mr. Devejian forwarded to the contracting officer what UMC characterized as a resubmission of UMC's updated claim, originally submitted to the Air Force on May 10, 1990, but dismissed without prejudice by the Armed Services Board of Contract Appeals (ASBCA) decision upholding the Air Force's arguments as to improper certification.[9] This June 11, 1992 revised

---

the May 10, 1990 submission to the contracting officer:

> Q: That number represents the actual invoice costs for direct material costs that U.M.C. had experienced for the first article units, correct?
> A: Yes.
> Q: That amount was not based on purchase orders was is it, Mr. Devejian?
> A: No, it was not.
> Q: But, purchase orders were available had you chosen to use them, correct?
> A: That's true.

8. As testified to at trial by Mr. Devejian, "unabsorbed fixed burden is the amount of burden that other contracts had to absorb because this [UMC's Floodlight Sets] contract had been delayed."

9. Prior to receiving a final decision by the contracting officer, UMC filed an appeal with the ASBCA. This appeal was dismissed without prejudice on May 22, 1992, due to nonconformity with certification requirements.

equitable adjustment claim was for $3,824,-638.00, and updated the impact of the alleged delay claim to April 1992.

UMC's June 11, 1992 claim submission expressly stated that it was predicated upon (a) the Government's failure to act within a reasonable time to approve and incorporate into the contract Government directed changes and required Engineering Change Proposals and (b) Government—caused delays which prevented UMC from meeting its production and shipping schedules due to the failure of the Government to approve Technical Orders ("TO's") as scheduled, and the Government's failure to provide UMC with shipping authorization during the 150–day period before the first production delivery under the contract. These failures to act by the Air Force have resulted in a delay of 246 days to UMC's contract performance.

The June 11, 1992 claim submission to the contracting officer included certifications by Mr. Devejian and UMC President E. William Bishop. Mr. Devejian testified that he thoroughly reviewed the claim and supporting documentation and understood that the certification would be relied upon by the contracting officer. This resubmission contained an Standard Form 1411 "Contracting Pricing Proposal Cover Sheet," a seven-page claim narrative, a new claim certification, and the summary pages of the updated claim submission. Mr. Devejian's June 11, 1992 cover letter informed the contracting officer that the voluminous supporting schedules for this claim submission had been sent to the contracting officer by Federal Express. UMC's June 11, 1992 claim submission included Exhibit F entitled "Increased Cost of Direct Materials Due to Delay." This exhibit notified the contracting officer that this portion of the claim was determined on the basis of the "Released to Date" quantity.

The June 11, 1992 claim made the following representation regarding the increased material costs portion of the claim:

In addition to unabsorbed overhead costs, the delay under this contract has caused UMC to incur increased material and direct labor costs because of the need to extend the period of production beyond the period originally planned. UMC's claim for increased material costs is based on the actual increases experienced during the delay period.

UMC also stated in the June 11, 1992 claim that UMC "will continue to incur increased costs of material and labor during the production period." In contrast to the May 10, 1990 and September 27, 1990 claims, Mr. Devejian acknowledged at trial that the June 11, 1992 claim contained no reference whatsoever to any projections with respect to material costs. During his testimony, Mr. Devejian concurred that UMC had actual material cost data available when it submitted the June 11, 1992 claim. As was demonstrated at trial, at the time UMC submitted its June 11, 1992 claim, it possessed all but one invoice for the materials used in the production of the units delivered and for the materials to be used in the remaining 144 units.

Mr. Devejian testified at trial that, at the time that UMC submitted its June 11, 1992, UMC had completed and delivered 2,343 units out of the 2,487 units that had been released by the Air Force, and only 144 units remained to be completed. In addition, UMC was close to completion of those units, as is indicated in a letter, dated December 7, 1992, from UMC's President, Mr. Bishop, to the contracting officer, informing the government that UMC had only eighteen work days remaining as of April 1, 1992 to complete the last 144 units.

In a letter dated June 19, 1992, Jeffrey Knowlton, the contracting officer, informed UMC that he was in receipt of the June 11, 1992 claim submission. This letter further stated that the contracting officer would not consider the claim unless he was provided with the types of supporting data that he believed were essential for resolving the claim. With respect to UMC's claim for increased direct material costs, Mr. Knowlton's June 19, 1992 letter stated in relevant part:

We cannot consider the request without detailed cost and pricing data as outlined in FAR 15.804–6, Table 15–2. Detailed supporting data for all elements as pre-

sented in the summary and exhibits B thru H of your claim are required. This includes, but is not limited to, copies of:

b) Quotes, bids, purchase orders/contracts, and correspondences that demonstrate the alleged increased material costs.

c) A priced bill of materials for pre- and post-alleged delay periods.

According to the joint stipulations submitted for the fraud trial, by letter dated July 1, 1992, UMC once again forwarded to Mr. Knowlton supporting Schedules 1 through 9 to its June 11, 1992 claim submission. The letter further stated that UMC will ship under separate cover the supporting cost and pricing data requested in the contracting officer's June 19, 1992 letter. Mr. Knowlton's office received purchase orders and some additional back-up information such as schedules, via Federal Express on July 2, 1992.

In a letter to Mr. Knowlton, dated July 9, 1992, UMC specifically described the materials it had submitted to the contracting officer, stating that the "purchase orders supporting the material pricing" and "[t]he supporting data sent to you on July 1, 1992, fully complies with the applicable section of the Instructions to Table 15-2." This letter further informed Mr. Knowlton that "[UMC] is seeking an adjustment to 27 purchase orders which were impacted by the delay, as documented in Schedule 7 supporting Exhibit F of the claim and in those same 27 purchase orders provided in response to Item 1(b) of your [June 19, 1992] letter." The letter also states, in relevant part:

UMC's cost data is categorized by cost element, by time periods and referenced to the original books and records from which they were derived. Having submitted, "... all accurate cost or pricing data reasonably available to the offeror ... either actually or by specific identification ...", as set forth in FAR 15.804-6, Table 15-2, Section 3, UMC has met or exceeded the requirements for submission of cost or pricing data.

As presented in UMC's letter of July 1, 1992, priced bills of material for pre- and post-alleged delay periods are not provided. No such documents exist. This information is not relevant to UMC's claim since UMC is not seeking an adjustment to the entire bill of material. It is seeking an adjustment to 27 purchase orders which were impacted by the delay, as documented in Schedule 7 supporting Exhibit F of the claim and in those same 27 purchase orders provided in response to Item 1(b) of your letter.

You state in paragraph two of your letter that UMC has presented a summary of "alleged" costs that is totally unsupported. UMC is not alleging the costs in its claim. UMC's claim consists of actual costs incurred which are fully documented in its books and records, and have been represented as accurate and complete in the certification accompanying its claim submission. These same books and records are audited regularly both by UMC's independent accountants and by Defense Contract Audit Agency (DCAA) representatives. DCAA routinely audits and reviews the same documents which have been provided to you in support of UMC's claim, including, but not limited to: Labor Cost Records, Work in Process Ledgers, Indirect Cost Reports, and Purchase Orders. In addition, DCAA audits UMC's progress billing vouchers, actual overhead rates, budgetary billing rates, and various cost proposals. Since the cost information provided to you is the same material frequently audited by DCAA, the supporting data represents the accurate, complete and current data applicable to the claim.

You have also commented that UMC should consider the applicable parts of FAR 31 in preparing its cost and pricing data. The data supplied by UMC is in full compliance with the applicable standards of the above referenced FAR. All costs are allowable as defined in FAR 31.201-2, are properly allocated in accordance with FAR 31.201-4, and all unallowable costs have been properly excluded pursuant to FAR 31.201-6. In addition, the standards of reasonableness set forth in FAR 31.201-3 have been met since UMC's costs:

(1) are "generally recognized as ordinary and necessary for the conduct of the Contractor's business or the contract

performance" by virtue of UMC's conformance to Generally Accepted Accounting Principles (GAAP), applicable statements issued by the Financial Accounting Standards Board (FASB), and its compliance with the cost allocability requirements of FAR 31.201–4

(2) are in accordance with generally accepted sound business practices and Federal and State laws and regulations, as mandated by the laws of the State of Connecticut, the Corporation Laws of the State of Delaware, U.S. Government law and the regulatory requirements of the Securities and Exchange Commission

(3) meet the Contractor's responsibilities to the Government, other customers, its stockholders, its employees and the public

(4) do not deviate from UMC's established practices.

It is clear that UMC meets all of the cost criteria contained in FAR 31.

(alterations in original).

At trial, Mr. Devejian testified regarding this letter and indicated that UMC was indeed representing to the contracting officer that the supporting cost or pricing data submitted complied with the applicable definition of "actual costs" in FAR Part 31.

The term "actual costs" as defined in FAR 31.001 is as follows:

"Actual costs," as used in this part (other than subpart 31.6), means amounts determined on the basis of costs incurred, as distinguished from forecasted costs. Actual costs include standard costs properly adjusted for applicable variances.

48 C.F.R. § 31.001.

In addition, Mr. Devejian testified that UMC's general ledger contained an account for material costs, which was not recorded as a material cost on the books until a valid invoice was received. The "actual costs incurred" that were submitted by UMC to the contracting officer in the June 11, 1992 claim submission were derived from purchase orders with vendors and suppliers, or as Mr. Devejian labeled it, the "total purchase order liability." In other words, these costs of UMC derived from purchase orders could reflect claim amounts that had never been invoiced and amounts for materials that had never even been received. UMC concedes in its post-trial brief that its alleged material costs claim, referred to by UMC as "actual costs," are not representative of amounts actually paid vendors or reflected on invoices.

At trial, the government presented evidence addressing the differential between invoices and purchase orders, to demonstrate that UMC included in its claim $195,984.00 in material costs that had never been paid to its vendors and for which UMC had never received invoices. One example of a differential, between UMC's claimed "costs" from purchase orders and the actual invoice, is "unbilled escalation" which occurred when a vendor did not bill or invoice UMC for an increase in material cost, despite the fact that purchase orders contained escalation clauses that typically triggered a price increase on a certain date. UMC elected to present the escalation price increase as "actual costs" in its June 11, 1992 claim submission because, as Mr. Devejian testified, he included amounts in the claim that he felt UMC would eventually owe to its vendors.[10]

---

**10.** At the time the June 1992 claim was submitted, UMC maintained a firm policy to pay vendors only invoiced amounts, and UMC did not pay vendors the amounts on purchase orders:

Q: [government counsel] U.M.C. pays its vendors or paid its vendors at the time the claim was submitted based on the amounts that were on the face of the invoices. Is that not true?

A: [Mr. Devejian] Yes, that's right.

Q: And it was the firm policy of U.M.C. to never pay a vendor more than what was on an invoice. Is that not true?

A: I can't imagine any circumstances why we would.

Consistent with this policy, as of June 11, 1992, UMC had not paid its vendors any amounts for the "unbilled escalation" because those vendors had not invoiced UMC for those amounts. To this day, UMC has never paid its vendors for the amounts of escalation that vendors chose not to invoice to UMC. Mr. Devejian also testified that UMC will not pay its vendors for "unbilled escalation" until UMC receives an invoice or a claim is approved and discharged in bankruptcy court.

As noted above, UMC's breakdown of its increased material costs is found in Exhibit F, attached to the June 11, 1992 claim and does not contain an explanation that some of the claimed increased material costs are estimates of amounts vendors might eventually invoice to UMC.[11]

A second example of a differential, between UMC's "costs" as claimed in the June 11, 1992 submission to the contracting officer from purchase orders and the actual invoice, identified in Mr. Michaud's testimony,[12] is that UMC included in its June 11, 1992 claim alleged increases in material costs on parts that had not been delivered, had not been invoiced, and had not been paid for by UMC. UMC included the supposed increases on these undelivered parts under the heading of "ACTUAL" on its supporting schedule without further explanation. Several of UMC's vendors failed to deliver the full complement of parts required under their respective purchase orders. A schedule compiled by Mr. Devejian shows, for example, that Thompson Saginaw Co. failed to deliver 102 brake packages; Wallace Forge Co., forty-seven (47) pintle hooks; Stewart Warner Hobbs Co., forty-five (45) hour meters; A & M Instrument Co., twenty (20) ammeters (seven (7) of one type and thirteen (13) of another) and fifteen (15) voltmeters; and Eberhard Manufacturing, ten (10) positive door holders. Mr. Devejian testified at trial that UMC has never been invoiced for these undelivered parts and has never paid its vendors for those parts; therefore, UMC has not recorded a cost for these undelivered parts.

Nevertheless, the June 11, 1992 submission includes claims by UMC for increased costs on undelivered parts from the government. An audit by DCAA also concluded that UMC had not received all parts contemplated by its purchase orders and had not received invoices for all of those parts. Mr. Michaud, the DCAA Investigations Eastern Regional Manager, testified that the audit determined that UMC nonetheless claimed from the government increased costs on those parts. According to Mr. Michaud, the DCAA auditors "summarized the invoices on those summary schedules by part number that we referred to, and the total, in many cases, were less than the full quantity of 2,487." Moreover, also according to Mr. Michaud, his audit review did not identify any vendor that had billed UMC for undelivered parts.

A third example of a differential between UMC's claimed "costs" pursuant to purchase orders as opposed to invoiced amounts, stems from a dispute in pricing with Teledyne Total Power (Teledyne), the manufacturer of the base engines. Teledyne supplied the engines to UMC for the floodlight sets. During the course of production, the purchase order with Teledyne was twice revised to reflect engineering changes to the engine, but the revisions did not impact the base price of the engines. UMC's claim for increased material costs, however, related to the engine purchases involved only the base engine price. Pursuant to the original purchase order, UMC agreed to pay a base price of $928.00 for each engine released in 1988 and 1989. The original purchase order also contained an escalation clause for each engine released after 1989, which Teledyne maintained triggered a price increase to $963.00 after the first 2,059 engines were furnished.

A dispute arose between UMC and Teledyne over the terms of that purchase order and the per unit price increase. Ultimately, because it was impractical for UMC to replace Teledyne on the NF–2D Floodlight Sets contract, combined with the cost of pursuing litigation against each other, the parties "decided to enter into language where they [Teledyne] would reserve their rights to a higher price on the purchase orders and continue to supply engines." Subsequently, on every invoice Teledyne submitted to UMC, Teledyne reserved its right to be paid an additional $62.70 per engine.

11. In fact, Exhibit D to the June 11, 1992 claim, that outlines the unabsorbed fixed burden, contains an explicit note under the heading "Released to Date" that states: "Based on Actual Costs and estimate to complete units Released to Date."

12. Andrew Michaud was the Eastern Regional Manager of the Investigations Support Division of the DCAA responsible for auditing UMC's claims on behalf of the government.

The differential that the government points to as an example of fraud in the equitable adjustment claim submitted to the contracting officer, is that UMC claimed as an "actual cost" in its submissions to the government $963.00 per base engine, the very amount that UMC had refused to pay Teledyne. Mr. Devejian testified at trial that UMC claimed from the government $963.00 per base engine from Teledyne, which reflects an increase in "cost" of $72,065.00 ($35.00 per base engine on the first 2,059 engines).

The invoices that Teledyne submitted to UMC reflect that the issue of pricing of the engines could be disputed in the future:

CONDITION OF SUBMISSION OF INVOICES BY TELEDYNE TOTAL POWER

By submission of these invoices at the unit price of $1,015.72, which is lower than the unit price on the invoices originally submitted ($1,078.42) by Teledyne Total Power to UMC, Teledyne Total Power in no manner relinquish[es] or releases its right to challenge the unit price and to seek reimbursement of the unit price difference of such invoices with respect to past, current, and future shipments.

The unit price of $1,015.72 reflects the base price of $928.00 per engine, in comparison, the unit price of $1,078.42 reflects the base price of $963.00 per engine.

The government and the contracting officer were aware that UMC had a price dispute with Teledyne that arose from alleged government caused delay. The documentary record indicates that the dispute was resolved in UMC's favor. Teledyne invoiced UMC only $928.00 for the first 2,059 base engines and UMC paid Teledyne only $928.00 for each of those base engines. In addition, Teledyne's invoices for all 2,450 engines it delivered were at the $928.00 base price.

UMC's June 11, 1992 claim for increased material costs is predicated upon the alleged impact of government delays upon UMC's purchase order agreements. UMC's claimed "obligations" under Teledyne purchase orders is reflected in the claim submitted to the government in that UMC sought a price adjustment "BASED ON CHANGE FROM THE 1989'S BASE PRICE TO THE 1990'S BASE PRICE." UMC's claim further identifies the price adjustment as the difference between the 1990 base price of $963.00 per engine and the 1989 base price of $928.00 per engine. The resulting $35.00 difference is the differential focused upon by the government.

UMC identified Teledyne as an unsecured nonpriorty creditor in the bankruptcy proceeding in the amount of $231,405.70. The amounts listed for Teledyne in the bankruptcy proceeding, as well as the other unsecured nonpriority creditors, were derived from UMC's accounts payable list, namely invoices, and does not reflect unbilled escalation derived from purchase orders. Teledyne is not only a named creditor, but also on the creditor's committee for the purposes of the bankruptcy proceeding. UMC's final liability to Teledyne or other creditors has not been resolved by bankruptcy court as the bankruptcy petition has not been discharged and a reorganization plan has not been submitted.

On August 11, 1992, Mr. Knowlton stated in a letter to UMC:

Due to the delay in receipt of the requisite supporting data to your claim, we have not yet completed our analysis. The back-up data was not received until the week of 15 Jul 92. We anticipate completion of our review by the week of 31 Aug 92.

By letter dated August 13, 1992, UMC informed Mr. Knowlton that its shipping receipts demonstrated that Mr. Knowlton was in receipt of the "requested additional supporting data" as of July 2, 1992, and that this submission duplicated information that had previously been supplied to Mr. Knowlton on May 20, 1992.

In his final decision dated November 19, 1992, the contracting officer, Mr. Knowlton, represented that "[t]his decision is made after careful and exhaustive review of all data supplied by UMC Electronics, hereafter referred to as UMC, by the Contracting Officer, the DCAA Auditor and the DCMAO technical representatives." The data supplied by UMC and reviewed by the contract-

ing officer, the DCAA auditor and the DCMAO technical representatives, consisted of UMC's claims, and the supporting claim schedules and data, including purchase order data. In the final decision, dated November 19, 1992, the contracting officer, Mr. Knowlton denied UMC's June 11, 1992 claim in its entirety. The stated basis for the denial was that:

UMC failed to provide any substantive proof or argument concerning the alleged causes or periods of delay. UMC merely made allegations and offered originally scheduled dates versus actual dates of performance as proof of the alleged Government-caused delay. The allegations made by UMC are completely unsupported and purposely fail to consider readily available factual material relevant to the dispute.

The contracting officer further found that

5. The bases of UMC's claim lack validity and in many cases constitute a misrepresentation of the facts. Some of the data submitted to support the quantum of the claim intentionally overlook established fact and available cost data in favor of the use of indices that inflate costs. Based on this, and in accordance with FAR 33.209, the claim and accompanying data is being submitted to the appropriate investigative agency.

In rendering his decision, the contracting officer also stated that "[t]here were no Change Orders, or directions issued by the Contracting Officer," and that "[t]he delays encountered in the performance of this contract were not the fault of the Government." Accordingly, the contracting officer concluded that the "bases of UMC's claim lack validity and in many cases constitute a misrepresentation of the facts."

As noted above, on or about November 20, 1992, UMC filed for bankruptcy protection in the United States Bankruptcy Court for the District of Connecticut. As part of its obligations in the bankruptcy court, on or about December 10, 1992, UMC filed certain summary schedules to establish its assets and liabilities. The truth and accuracy of those schedules was certified to under penalty of law by the President of UMC, William E. Bishop. Among the schedules filed by UMC was "Schedule F, Creditors Holding Unsecured Non–Priority Claims." This schedule, that was developed from a cash flow report generated by Mr. Devejian, required UMC to list each of its unsecured, non-priority creditors and the amounts owed to those creditors.[13] According to Mr. Devejian, UMC's controller, the amounts listed as owing to UMC's material vendors in UMC's bankruptcy filings are the unpaid invoices listed on the cash flow report. The amounts listed as owing on UMC's Schedule F bankruptcy filing did not include amounts for unbilled escalation, nor did it reflect amounts owed to vendors for parts that were never delivered and for which invoices were not received. Mr. Devejian also conceded at trial that UMC did not claim on its Schedule F that it owed Teledyne for the $72,065.00 ($35.00 per base engine on the first 2,059 engines) that had been the subject of the pricing dispute. The amounts listed in bankruptcy Schedule F for Teledyne, as well as all other creditors, was derived from UMC's accounts payable list.

On February 16, 1993, UMC filed an adversary complaint against the United States in the United States Bankruptcy Court for the District of Connecticut, Case No. 92–53869, Adversary Proceeding No. 93–5045. The bankruptcy court complaint set forth UMC's claim for an equitable adjustment under the contract based on the Government Delay of Work and Changes Clauses and asked for $3,343,903.00 in damages. In addition to the requests for equitable adjustment submitted to the government, on or about August 12, 1993, counsel for UMC submitted a document entitled Plaintiff's "Monetary Claim Breakdown and Schedules" to the United States Bankruptcy Court for the Dis-

---

13. Mr. Devejian testified that UMC's bankruptcy counsel, Thomas Marrion, specifically requested an accounts payable list to determine UMC's debts to its unsecured, non-priority creditors. Mr. Devejian generated a computer printout of a cash flow report served as all accounts payable ledger. Mr. Devejian conceded that a cash flow report listing unpaid invoices to material vendors was available to him when he submitted the June 11, 1992 claim, but he did not refer to it in preparing that claim.

trict of Connecticut. This document was prepared and filed on behalf of UMC by UMC's counsel at the direction of the bankruptcy court for purposes of settlement discussions. Exhibits A through I of this document were prepared by UMC's bankruptcy counsel on the basis of information supplied to him by Mr. Devejian.

Plaintiff's Monetary Claim Breakdown and Schedules filed in the bankruptcy court identifies UMC's total claim as $6.09 million. The increased amount was attributable to a re-calculation of the increased direct labor experienced by UMC during the production phase of the contract and increased claim preparation costs. UMC's calculation of the increased material costs decreased slightly due to an adjustment in the applicable general accounting and administrative overhead rate. The methodology used in plaintiff's Monetary Claim Breakdown and Schedules for quantifying UMC's increased direct material costs, noted in Exhibit F sent to the bankruptcy court, is the same methodology used by Mr. Devejian in the June 11, 1992 claim submission to the contracting officer. Exhibit F to Plaintiff's Monetary Claim Breakdown and Schedules incorporates a multi-page document labeled "Schedule 7." "Schedule 7" is one of the documents that Mr. Devejian sent to the contracting officer by Federal Express in conjunction with the June 11, 1992 claim submission. Exhibit F of the August, 1993 submission of the bankruptcy court again quantified UMC's claim for increased material costs on the basis of the "Released Quantity" of 2,487 Floodlight Sets.

The United States Bankruptcy Court dismissed UMC's adversary complaint without prejudice and ordered the plaintiff to file the same complaint in the United States Court of Federal Claims. Subsequently, UMC filed its complaint in the United States Court of Federal Claims appealing the contracting officer's November 19, 1992 final decision, and seeking $5.66 million plus interest on its equitable adjustment claim under the contract, based on the alleged government delay of work for the government's failure to timely approve and incorporate government-directed changes into the contract and for requir-

ing engineering change proposals. The complaint states, in relevant part to the instant counterclaim proceeding, regarding the source of data for UMC's claim:

77. The June 11, 1992 updated resubmitted Claim sought an equitable adjustment to the contract price in the amount of $3,482,066, including interest to that date, for the 2,487 production units ordered to date under the Contract, as updated to April, 1992, based on UMC's actual cost records for Fiscal (Calendar) Years 1988 through April, 1992.

UMC seeks the same amount of increased material costs that it sought in its June 11, 1992 claim to the contracting officer.

On November 8, 1995, two weeks after this court granted leave to the government to file its fraud counterclaim, UMC amended its schedule of unsecured, non-priority creditors in the bankruptcy proceeding. This amendment carries the declaration under penalty of law by Mr. Devejian that the information in the amendment is true and correct. The amended schedule included amounts owed for unbilled escalation that had not been included in the original bankruptcy filings in December 1992. One example of the amendments to incorporate unbilled escalation, is that UMC's original creditor schedule indicated that no amount was owed to Fenwall Inc.; however, the amendment listed a debt of $550.88, the precise amount of escalation that Fenwall chose not to invoice to UMC. Although only six months had intervened between the June 11, 1992 claim and the filing of the original bankruptcy schedules, Mr. Devejian testified that if he had known vendors were owed these amounts when the original bankruptcy schedule was filed, he would have included them as debts in the filing in December 1992. In addition, it appears from the record before this court that none of the other vendors on the floodlight contract claimed amounts in bankruptcy for unbilled escalation or for undelivered parts. UMC's liability to its creditors, however, will only be resolved when UMC submits a plan for reorganization for approval by the bankruptcy court along with the creditor's committee.

Based on the complaint in this court, the submissions in the bankruptcy court, and the prior submissions to the contracting officer, and because the defendant filed fraud counterclaims, the court held a trial first on the government's counterclaims, seeking damages of $223,500.00[14] against UMC, under the Special Plea in Fraud, 28 U.S.C. § 2514; the False Claims Act, 31 U.S.C. § 3729; and the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604. The trial on the fraud counterclaims was conducted prior to a trial on the plaintiff's claims for an equitable adjustment because if the government were to be successful on its fraud counterclaim, the plaintiff's claim would be forfeited pursuant to 28 U.S.C. § 2514.

## DISCUSSION

The court enjoys the benefit of a considerable record, created during the course of pretrial proceedings and the trial on the government's counterclaim. The availability of extensive exhibits and testimony adduced from witnesses on behalf of UMC and the Air Force, and numerous expert witnesses, has allowed the court to address this fact-laden dispute and to make the factual and credibility determinations required to resolve the dispute before the court.

The trial before the court was held to address the United States' counterclaims under the Special Plea in Fraud, 28 U.S.C. § 2514, the False Claims Act, 31 U.S.C. § 3729, and the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604. Prior to addressing each of the legal theories invoked by the government; the court notes that the legislative history of the Contract Disputes Act states that the available remedies should be considered cumulative and not in the alternative. Specifically, the congressional report explaining the antifraud provision of the Contract Disputes Act states in relevant part:

This provision is intended to be separate and distinct from the rights now possessed by the Government in legislation such as the False Claims Act, 31 U.S.C. [§ ] 231 *et seq.*, or the Forfeiture Statute, 28 U.S.C. [§] 2514. That is, section 4(b) [the antifraud provision, codified at 41 U.S.C. § 604] is not intended in any way to diminish the rights now afforded to the Government under current legislation.... Section 4(b) will afford the Government a separate and additional remedy of recovering an amount equal to the fraudulent or misrepresented amount.

S.Rep. No. 95–1118, 95th Cong., 2d Sess. 20 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235.

In the case at bar, the government invokes the Special Plea in Fraud, pursuant to 28 U.S.C. § 2514, as a defense to the claims contained in UMC's complaint. The statute in question, 28 U.S.C. § 2514, reads:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. This court finds the mandate of the words employed in 28 U.S.C. § 2514 to be clear and unequivocal. The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during contract performance or in the making of a claim.

There is no suggestion in the statute that a contract can be divided up into performance sectors to allow payment of some claims on a corrupted contract while other claims on the same contract are forfeited.

---

14. The government states in its papers how it arrived at its misrepresentation figures for the fraud counterclaims:

DCAA arrived at this figure by comparing UMC's actual increased material costs derived from its vendor invoices, to its claimed increased material costs. DCAA determined that UMC in fact experienced a decrease in material costs of $84,077, rather than an increase of $111,907 as claimed for the parts analyzed.... DCAA arrived at the $223,500 in total damages by multiplying the overstatement of material costs ($195,984) by the same rates for freight (2.6%) and general and administrative expenses (11.[1]5%) as UMC applied to its claim for material costs.

(citations omitted).

The effects of a fraudulent act, therefore, have an impact on every aspect of contract performance and the entirety of the claim, making it impossible to distinguish between tainted and untainted claims, for which reason the contractor may not recover on any claims under the contract.

In *Little v. United States*, 138 Ct.Cl. 773, 778, 152 F.Supp. 84, 87–88 (1957), the court wrote:

It is true that the forfeiture statute was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V302OV–241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the government. *See also New York Mkt. Gardeners' Ass'n. v. United States*, 43 Ct.Cl. 114, 136, 1907 WL 832 (1908). The court in *Kamen Soap Prods. Co. v. United States*, 129 Ct.Cl. 619, 641, 124 F.Supp. 608, 620 (1954) also stated that "this statute goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim."

In *New York Market Gardeners' Association. v. United States*, 43 Ct.Cl. 114, 136, 1907 WL 832 (1908), the Court of Claims also explained that all claims which are part of a contract during which a corrupt or fraudulent practice has occurred, even just on one aspect of the contract, should be forfeited. That court stated as follows:

The Revised Statutes provide that any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance of any part of any claim against the Government shall ipso facto forfeit the same. It would be the duty of the court to declare forfeited the entire contract if the proof certainly established the charge made. Harsh as the statutes are which impose such severe penalties for fraud in making up a claim, it is yet a necessary statute for the protection of the Government, and when such a charge is established this court will not only not hesitate to enforce such penalties but will go to whatever extreme under the law which can be justified by the facts proven.

*Id.; see also Ab–Tech Constr., Inc. v. United States*, 31 Fed.Cl. 429, 435–36 (1994), *aff'd*, 57 F.3d 1084 (Fed.Cir.1995); *Brown Constr. Trades, Inc. v. United States*, 23 Cl.Ct. 214, 216 (1991).

■ The burden is on the government to establish by clear and convincing evidence, *Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed.Cir.1994), that the claimant has committed the fraud alleged, *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed.Cir.1998). *See also McCarthy v. United States*, 229 Ct.Cl. 361, 373, 670 F.2d 996, 1003 (1982); *O'Brien Gear & Mach. Co. v. United States*, 219 Ct.Cl. at 199, 591 F.2d at 672; *Miller v. United States*, 213 Ct.Cl. 59, 68, 550 F.2d 17, 22 (1977); *Kamen Soap Prods. Co. v. United States*, 129 Ct.Cl. at 642, 124 F.Supp. at 620.

■ The United States Court of Appeals for the Federal Circuit has articulated, that in order for the government to prevail under the Special Plea in Fraud, the government must prove by clear and convincing evidence "that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." *Young–Montenay, Inc. v. United States*, 15 F.3d at 1042 (citing *McCarthy v. United States*, 670 F.2d at 1004); *see also Commercial Contractors, Inc. v. United States*, 154 F.3d at 1362.

The government also has invoked the False Claims Act, 31 U.S.C. § 3729, to rebut the complaint filed in this court by the plaintiff UMC. The False Claims Act, 31 U.S.C. § 3729 provides the standards for liability:

(a) **Liability for certain acts.**—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\* \* \* \* \* \*

is liable to the United States Government for a civil penalty of not less than \$5,000 and not more than \$10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .

\* \* \* \* \* \*

**(b) Knowing and knowingly defined.—** For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

In addition, the False Claims Act contains a definition of "claim:"

**(c) Claim defined.—**For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729. The government must prove the elements of a cause of action under the False Claims Act by a preponderance of the evidence. *See* 31 U.S.C. § 3731(c).

■ The United States Court of Appeals for the Federal Circuit delineated the government's right to recovery under the Act:

In order to recover damages for violation of the False Claims Act, the government must establish that

(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;

(2) the claim was false or fraudulent;

(3) the contractor knew the claim was false or fraudulent; and

(4) the United States suffered damages as a result of the false or fraudulent claim.

*Young–Montenay, Inc. v. United States,* 15 F.3d at 1043 (quoting *Miller v. United States,* 550 F.2d 17, 23, 213 Ct.Cl. 59 (1977)).[15]

---

**15.** Under the False Claims Act, there is a statutory definition of the intent requirement necessary (*i.e.,* "the contractor knew the claim was false or fraudulent"); specifically, that a person acted " 'knowing' and 'knowingly' mean that a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729. Many Circuit Courts of Appeal recognize that the plain language of the knowledge requirement does not require "specific intent" but instead incorporates the intent standards of "actual knowledge," "deliberate ignorance" and "reckless disregard." *See, e.g., Harrison v. Westinghouse Savannah River Co.,*

176 F.3d 776, 784–85 (4th Cir.1999); *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998); *United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 303 (6th Cir.1998); *United States ex rel. Aakhus v. Dyncorp, Inc.,* 136 F.3d 676, 681–82 (10th Cir.1998); *United States v. Krizek,* 111 F.3d 934, 941–42 (D.C.Cir.1997); *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1478 (9th Cir.1996); *United States v. TDC Management Corp.,* 24 F.3d 292, 297–98 (D.C.Cir.1994); *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1420–21 (9th Cir.1992). As noted above, under the False Claims Act, reckless disregard may be considered the equivalent of "aggravated form of gross negligence, or 'gross negligence-plus.' " *United States ex rel. Aakhus v. Dyncorp, Inc.,* 136

The United States Court of Appeals for the District of Columbia, in *United States v. Krizek,* 111 F.3d 934 (D.C.Cir.1997), carefully discussed and summarized the intent and knowledge required under the False Claims Act, as follows:

> The question, therefore, is whether "reckless disregard" in this context is properly equated with willful misconduct or with aggravated gross negligence. In determining that gross negligence-plus was sufficient, the District Court cited legislative history equating reckless disregard with gross negligence. A sponsor of the 1986 amendments to the [False Claims Act] stated,
>
>> Subsection 3 of Section 3729(c) uses the term "reckless disregard of the truth or falsity of the information" which is no different than and has the same meaning as a gross negligence standard that has been applied in other cases. While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government. The Act is also intended not to permit artful defense counsel to require some form of intent as an essential ingredient of proof. This section is intended to reach the "ostrich with-his-head-in-the-sand" problem where government contractors hide behind the fact they were not personally aware that such overcharges may have occurred. This is not a new standard but clarifies what has always been the standard of knowledge required.
>
> 132 Cong.Rec. H9382–03 (daily ed. Oct. 7, 1986) (statement of Rep. Berman). While we are not inclined to view isolated statements in the legislative history as dispositive, we agree with the thrust of this statement that the best reading of the Act defines reckless disregard as an extension of gross negligence. Section 3729(b)(2) of the Act provides liability for false statements made with deliberate ignorance. If the reckless disregard standard of section 3729(b)(3) served merely as a substitute for willful misconduct—to prevent the defendant from "deliberately blind[ing] himself to the consequences of his tortious action"—section (b)(3) would be redundant since section (b)(2) already covers such struthious conduct. *See Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988) (citing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"). Moreover, as the statute explicitly states that specific intent is not required, it is logical to conclude that reckless disregard in this context is not a "lesser form of intent," *see Steadman,* 967 F.2d at 641–42, but an extreme version of ordinary negligence.

*United States v. Krizek,* 111 F.3d at 941–42 (alterations in original).

Congress specifically rejected requiring a specific intent to defraud under the False Claims Act. *See* 31 U.S.C. § 3729(b). Instead, it adopted a knowing standard, defined as "actual knowledge of the falsity," acting in "deliberate ignorance of the truth or falsity," or "acting in reckless disregard of the truth or falsity." *Id.* The standard was designed to address "the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." *See* S.Rep. No. 99–345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Thus, the statute covers not just those who set out to defraud the government, but also those who ignore obvious warning signs.

In *United States v. Krizek,* the United States Court of Appeals for the District of Columbia Circuit found a doctor guilty of reckless disregard when he delegated to his wife the authority to bill for him and completely failed to review the bills she submitted. 111 F.3d at 942 (noting three days for which the Krizeks billed for more than twenty-four hours per day). It is apparent that this reckless disregard standard prevents defendants from simply pointing to confusion over invoices and billing records as a complete defense. In *United States v. Lorenzo,*

F.3d at 682 (citing *United States v. Krizek,* 111 F.3d at 941–42).

768 F.Supp. 1127, 1131 (E.D.Pa.1991), the dentist defendants claimed they did not act knowingly because any billing errors resulted from an unintentional confusion over the billing procedures. *Id.* The court rejected this defense, finding that "[a]t the very least, they acted in reckless disregard of the truth or the falsity of the information they inserted on the form." *Id.* at 1132.

Therefore, a critical issue before the court is whether plaintiff had knowledge, as defined by the False Claims Act, that its claims to the contracting officer were false or fraudulent to include reckless disregard. To prove a violation of the False Claims Act, the government can, but need not prove that a party intended to deceive the government. *United States v. TDC Management Corp.,* 24 F.3d at 298. The False Claims Act requires only that the government prove that a party knowingly, as defined under the Act, submitted a claim with reckless disregard to the falsity of the information. 31 U.S.C. § 3729(b); *United States v. TDC Management Corp.,* 24 F.3d at 298; *Wang ex rel. United States v. FMC Corp.,* 975 F.2d at 1420. Therefore, at a minimum, every party filing a claim before the contracting officer and this court has a duty to examine its records to determine what amounts the government already has paid or whether payments are actually owed to subcontractors or vendors. The case law stands for the proposition that a failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard, and a contractor that deliberately ignored false information submitted as part of a claim is liable under the False Claims Act. *United States v. TDC Management Corp.,* 24 F.3d at 298. To find otherwise would allow parties filing an action in this court to "double-bill" the government and then hide behind a posture of feigned ignorance.

Contractors in a False Claims Act case, such as UMC in the instant action, not infrequently contend that their claims were not false because an interpretation of relevant regulations permits their claims. *See, e.g., Cahill v. Curtiss-Wright Corp.,* 57 F.Supp. 614, 616–17 (W.D.Ky.1944) ("A mistake in judgment, even though damaging, is not

fraud.") (finding defendant free from False Claims Act liability because conditions complied with inspection requirements). A contractor, upon submission of a claim, who is aware of and takes advantage of a disputed legal issue does not knowingly commit fraud. *See Hagood v. Sonoma County Water Agency,* 81 F.3d at 1478–79 (finding that the defendant made an imprecise cost allocation and that the government agency involved did not have settled view on proper interpretation of relevant statute for which reason holding that the evidence at most revealed a disputed legal issue).

However, it is a matter of law for the court to interpret a relevant statutory or regulatory requirement and if the language of the requirement is clear, even expert testimony is not persuasive. *See United States v. Race,* 632 F.2d 1114, 1120 (4th Cir.1980). As the United States Court of Appeals for the Fourth Circuit stated:

> We attach no weight to Commander Dolina's expert testimony on the interpretation of this clause. The clause includes no words of art, but only words of common understanding and use, requiring no special expertise for their interpretation. Expert testimony on the meaning of such language is both superfluous and improper. *Marx & Co., Inc. v. Diners' Club, Inc.,* (2nd Cir.) 550 F.2d 505, 510, *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The meaning of a clause, couched as this one was in language of common use and understanding, was purely a matter of law for the court, which should have granted the defendants' motion to dismiss any charge based on the defendants' billing for per diem under the contract.

*United States v. Race,* 632 F.2d at 1120; *see also United States v. Calhoon,* 97 F.3d 518, 523–24 (11th Cir.1996).

Moreover, an innocent mistake or mere negligence such as a math error or flawed reasoning may be excused. *Wang ex rel. United States v. FMC Corp.,* 975 F.2d at 1420–21. "The statutory phrase 'known to be false' does not mean 'scientifically untrue'; it means 'a lie.'" *Hagood v. Sonoma County Water Agency,* 81 F.3d at 1478–79 (citing *United States ex rel. Anderson v. Northern*

*Telecom, Inc.,* 52 F.3d 810, 815–16 (9th Cir. 1995)); *see also United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir.1999) (summarizing innocent mistake cases).

 Thus, under the False Claims Act there must be a showing by the government of more than an innocent mistake or mere negligence. *Wang ex rel. United States v. FMC Corp.,* 975 F.2d at 1420. The government in the instant case is required to show the knowing presentation by the contractor of information known to be "false or fraudulent." *Id.; see also Young–Montenay, Inc. v. United States,* 15 F.3d at 1043. The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." *United States v. Adler,* 623 F.2d 1287, 1289 (8th Cir.1980).

Although the statute defines "knowing and knowingly" and "claim," the courts have had to interpret the meaning of "false or fraudulent." *See* 31 U.S.C. § 3729(b)–(c). Unlike the question of intent, this element, specifically whether the claim was false or fraudulent, involves a fact specific reasonableness determination because:

> There are thousands of different factual situations that citizens certify to various departments of the government every day. In some instances the false statement concerns something that in itself constitutes a crime. In many cases, however, as in the instant case, the criminal element is found exclusively in the misrepresentation or nondisclosure of a material fact.

*United States v. Seay,* 718 F.2d 1279, 1286 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984); *see also United States v. Race,* 632 F.2d at 1120; *United States v. Adler,* 623 F.2d at 1289; *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.1978). However, the requisite intent to make false statements may be inferred, also on a fact specific basis, in appropriate circumstances. *See United States v. Adler,* 623 F.2d at 1289.

The government also raises the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604, to recover the false or unsupported portion of UMC's claim attributable to a misrepresentation of fact or fraud. The

Contract Disputes Act provides that a contractor who is unable to support any part of a claim because of a misrepresentation of fact or fraud on the part of the contractor shall be liable to the government for the unsupported part of the claim, as well as for the government's costs expended in reviewing the claim. *See* 41 U.S.C. § 604. Specifically the statute states:

### § 604. Fraudulent claims

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

The Contract Disputes Act defines the term "misrepresentation of fact" as

> a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.

41 U.S.C. § 601(7). To recover under the Contract Disputes Act, therefore, the government is required to demonstrate that the contractor made false or fraudulent statements in the claim that was submitted, with the requisite intent to deceive or mislead the government. *See id.* The United States Court of Appeals for the Federal Circuit delineated the standard of proof by which the government needs to establish a right to recovery under the Contract Disputes Act as follows:

> Although the statute does not prescribe a standard of proof, the "preponderance of the evidence" standard has been applied in the past, *see Al Munford, Inc. v. United States,* 34 Fed.Cl. 62, 67 (1995), *vacated on other grounds,* 86 F.3d 1178, 1996 WL 252834 (Fed.Cir.1996) (Table), and we agree that the traditional civil standard is appropriate here. *See Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389–90, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

*Commercial Contractors, Inc. v. United States*, 154 F.3d at 1362. Similarly, the United States Supreme Court appears to be edging toward a preponderance of the evidence standard in a widening variety of civil fraud cases. *See Grogan v. Garner*, 498 U.S. 279, 287–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (establishing the preponderance standard in bankruptcy fraud cases); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–89, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (establishing the preponderance standard in Securities & Exchange Commission fraud cases).

The Contract Disputes Act requires that the contractor "must submit in writing 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" *H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1565 (Fed.Cir.1995) (citing *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987)); *Pevar Co. v. United States*, 32 Fed.Cl. 822, 824 (1995). "To satisfy the [Contract Disputes Act], a claim need not contain any particular language or conform to any specific format." *Pevar Co. v. United States*, 32 Fed.Cl. at 824. "[T]he contractor need not include a detailed breakdown of costs. The contractor may supply adequate notice of the basis and amount of the claim without accounting for each cost component." *H.L. Smith, Inc. v. Dalton*, 49 F.3d at 1565.

■ The purpose of an equitable adjustment is to make the contractor whole. *Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516, 518 (1963) ("Equitable adjustments ... are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract."). One of the prime purposes of the Contract Disputes Act is to provide a "fair" and "balanced" system to negotiate and resolve contract claims. S.Rep. No. 95–1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235; *see H.L. Smith, Inc. v. Dalton*, 49 F.3d at 1566. The statutory framework of the Contract Disputes Act accomplishes this goal, in part, by "equaliz[ing] the bargaining power of the parties when a dispute exists." S.Rep. No. 95–1118, 95th

Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235.

Another component of the Contract Disputes Act is the certification requirement for contractors claiming equitable adjustments above the statutory amount, to certify that the claim submitted is

> made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable....

41 U.S.C. § 605(c)(1). Congress mandated the certification requirement to "discourag[e] the submission of unwarranted contractor claims" and to encourage settlements, S.Rep. No. 95–1118, 95th Cong., 2d Sess. 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5239, quoted in *Transamerica Insur. Corp. v. United States*, 973 F.2d 1572, 1579 (Fed.Cir. 1992), and to "trigger[ ] a contractor's potential liability for a fraudulent claim under section 604 of the [Contract Disputes] Act," *Fischbach & Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 763 (Fed.Cir.1993) (quoting *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414, 418 n. 11 (1985); *In re Folk Constr. Co.*, 226 Ct.Cl. 602, 1981 WL 21438). With these tools, Congress hoped to curtail the "so-called horsetrad[ing]" theory of negotiating equitable adjustment claims then prevalent which oftentimes resulted in a "windfall" to the contractor. S.Rep. No. 95–1118, 95th Cong., 2d Sess. 20 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235.

### I. The June 11, 1992 Claim

Unlike its earlier claim submissions, UMC had nearly completed production of the NF–2D Floodlight Sets when it submitted its June 11, 1992 claim for an equitable adjustment to the contracting officer. As of that date, UMC had completed and delivered 2,343 units out of the 2,487 units that had been released by the Air Force; 144 units remained to be completed. However, UMC was close to completion of those units as well. In a letter dated December 7, 1992, UMC's President Mr. Bishop informed the contracting officer that as of April 1, 1992, which was more than two months before the June 11,

1992 claim was submitted, UMC had only eighteen work days remaining to complete the last 144 units.

In further contrast to the earlier May 10, 1990 and September 27, 1990 claims, Mr. Devejian acknowledged that UMC had actual material cost data available when it submitted the June 11, 1992 claim. In fact, at the time UMC submitted its June 11, 1992 claim, it possessed virtually every invoice for the materials used in the production of the units delivered and substantially all the invoices for the materials to be used in the remaining 144 units. Contracting officer Jeffrey Knowlton testified that he would have expected UMC to base, as required by the FAR, its June 11, 1992 claim on invoiced and paid amounts, *i.e.* incurred costs, because the claim was submitted near the completion of the contract. By contrast, Mr. Knowlton testified that a claim submitted at the beginning of production would more likely consist of projected costs, and a claim submitted towards the middle of contract performance would utilize a combination of methods. UMC's expert, Darrell J. Oyer, agreed that additional incurred actual cost data would be available nearer the end of a production period, including invoices and canceled checks.

Mr. Knowlton further testified that in the May 10, 1990 and the September 27, 1990 claim, UMC "showed good understanding that a claim had to be broken down by actual and incurred costs plus projected costs," and in fact, that UMC "followed the FAR provisions of 15–804–6 almost to the letter." Yet, in the June 11, 1992 claim, in subsequent documents received, and in discussions held following the time of the June 11, 1992 claim, nowhere and at no time "was it indicated that it [the claim] was anything other than actual costs." The contracting officer's understanding of the term "actual costs" in the context of UMC's June 11, 1992 claim had been reinforced by UMC's use of the term to mean invoiced costs in its earlier claim submissions. Mr. Knowlton further testified that UMC's careful segregation of its actual costs and its projected costs in the May 1990 and September 1990 claims also led him to believe UMC's use of the term "actual" in the June 11, 1992 claim meant invoiced costs.

Therefore, "having reviewed the previous two claims, I really understood that U.M.C. understood the requirement to outline which is factual and which is judgmental and in this case, they just—it was all submitted as actual, so I considered it factual ... as part of their submission."

Mr. Devejian testified about a letter dated July 9, 1992, which he had signed, and in which UMC represented to the contracting officer that the supporting cost or pricing data submitted to the contracting officer complied with all the provisions of FAR Part 31, including the definition of "actual costs" in FAR 31.001. Mr. Devejian acknowledged that FAR 31.001 applied to UMC's claim and that he was familiar with that provision. The term "actual costs" is defined in that section of the regulations as follows:

> "Actual costs," as used in this part (other than subpart 31.6), means amounts determined on the basis of costs incurred, as distinguished from forecasted costs. Actual costs include standard costs properly adjusted for applicable variances.

48 C.F.R. § 31.001.

Although he attempted to disavow and confuse what he had said at his deposition testimony, and to avoid answering opposing counsel's questions, Mr. Devejian admitted that those invoiced costs on UMC's general ledger are its "actual costs incurred." Mr. Devejian explained that:

> The actual costs incurred are reported in many ways, including SEC reports, both quarterly and annually, as well as in our reports issued by our public accountants and, of course, from our general ledger and our books of accounts which DCAA had access to.

UMC's general ledger contained an account for material costs. In accordance with the Generally Accepted Accounting Principles, which UMC adhered to, UMC did not record an item as a material cost on its books until it received a valid invoice for that cost.

The testimony of government witnesses at trial corroborated that FAR 31.001, governs the definition of actual costs, including the concept of "costs incurred." Mr. Knowlton, the contracting officer, testified that he un-

derstood the term "actual costs" to mean those costs incurred and backed up by UMC's books and records. Andrew Michaud, a supervisory DCAA auditor, also testified that in his experience as an auditor, "actual costs" meant "a cost that's incurred as opposed to a forecasted cost." Mr. Michaud further testified that under Generally Accepted Accounting Principles, a "[c]ost is incurred at the point at which it is invoiced and paid." Ms. Tracy Barney, an auditor with the DCAA, concurred in her testimony that "actual costs would mean costs incurred.... Those would be costs, that are either paid or invoiced." Even Mr. Oyer, UMC's expert, acknowledged that "actual costs" are historic costs, as distinguished from forecasted costs—the very same distinction Mr. Devejian acknowledged to have been utilized in UMC's May 10, 1990 and September 27, 1990 claims.

In contradiction to its repeated and unequivocal representations to the contracting officer, UMC's June 11, 1992 claim was not based on its actual costs incurred, as that term is defined by the FAR, by UMC, and by the government: the invoiced costs found in the material costs account of its general ledger. Instead, as admitted by Mr. Devejian during his testimony, UMC included the total amount of the purchase orders with its vendors and represented those amounts as its "actual costs incurred" to the government. UMC included in its material costs claim, the total amount of the purchase orders, irrespective of whether UMC had received the materials or a valid invoice, or whether UMC treated the amount as a cost in its material costs account or other formal accounting records. In fact, UMC included in its June 11, 1992 claim amounts that had never been invoiced and amounts for materials that had never even been received. In total, according to government Exhibit 2015 titled "UMC's Claimed Increases v. Actual Increases in Material Costs," UMC included in its claim $195,984.00 in material costs that had never been paid to its vendors and for which UMC had never received invoices.[16] Nowhere in its June 11, 1992 claim submission did UMC

explain that its increased material costs portion of the claim was based on purchase orders, rather than actual costs. This approach was inconsistent with the claim submissions to the contracting officer prior to the June 11, 1992 claim, which had delineated between actual incurred costs (i.e., those costs invoiced and paid by UMC) and projected costs (i.e., those costs anticipated to be paid by UMC).

Many of UMC's purchase orders contained escalation clauses that typically triggered a price increase on a particular date. Upon questioning by government counsel, Mr. Devejian reluctantly admitted that certain vendors never billed UMC for the escalation in those purchase orders ("unbilled escalation"):

Q: Is it not true, Mr. Devejian, that most of U.M.C.'s vendors chose not to avail themselves of those escalation clauses?

A: That's not true.

Q: Many of them did not. Is that not true?

A: No, that's not true either.

Q: Is it not true that at least some of them did?

A: Very few of them. I'm sorry. What was the original question, Mr. Shaikun?

Q: The question is is it not true that some of the vendors chose not to bill U.M.C. for the escalated amount that was included in the purchase orders?

A: Very few of them [ ] failed to. I would not say they chose to.

Q: They did not bill you for that amount, did they?

A: Very few of them did not bill us for the escalation to which they were entitled under the purchase order.

Q: And it is your testimony that it was very few. Is that correct?

A: I didn't say very few. I said few.

Q: I just want to be sure I am clear on your testimony. Your testimony is that a few vendors failed to charge

16. Although UMC took issue with Exhibit 2015, the amounts reflected in this exhibit were not successfully impeached nor placed into doubt by

UMC in pleadings or at trial, as is discussed below.

U.M.C. the escalated amount under the purchase orders. Is that right?

A: By few, I mean perhaps a handful, but that's right.

Although Mr. Devejian testified that "few" vendors chose not to bill UMC for escalation, a schedule submitted to the government shows that the number was much greater. The schedule compares UMC's claim for material cost increases with DCAA's audit of the claim. The schedule showed that UMC's claim exceeded DCAA's audit findings (which was based on a review of invoices and canceled checks) for fourteen (14) of the twenty-one (21) vendors analyzed. Mr. Devejian stated on the schedule that "[i]n most cases, vendors failed to invoice UMC for escalation authorized in the P.O.s [purchase orders]."

At trial, Mr. Devejian denied that he was aware at the time the June 11, 1992 claim was submitted that vendors had not invoked the escalation clause. Mr. Devejian after a number of evasive answers conceded, however, that his trial testimony differed from his deposition testimony, during which he admitted that in some cases he "probably knew" that vendors had failed to bill for escalation. More importantly, Mr. Devejian further testified that UMC did not pay an invoice until it matched the invoice with a purchase order and receiving report, thereby implicitly acknowledging that UMC knew of disparities between the invoices and purchase orders.[17]

At the time the June 11, 1992 claim was submitted, UMC maintained a firm policy to pay vendors only invoiced amounts. UMC did not pay vendors the amounts on purchase orders, as Mr. Devejian indicated at trial:

Q: U.M.C. pays its vendors or paid its vendors at the time the claim was submitted based on the amounts that were on the face of the invoices. Is that not true?

A: Yes, that's right.

Q: And it was the firm policy of U.M.C. to never pay a vendor more than what was on an invoice. Is that not true?

A: I can't imagine any circumstances why we would.

Consistent with this policy, as of June 11, 1992, UMC had not paid its vendors any amounts for the unbilled escalation because those vendors had not invoiced UMC for those amounts. Indeed, to this day, UMC has never paid its vendors for the amounts of escalation that vendors failed to invoice. Mr. Devejian also testified that UMC will not pay its vendors for unbilled escalation until UMC receives an invoice (or a claim is discharged in bankruptcy court). In fact, UMC did not record the amount of unbilled escalation as an actual cost in its material costs account until the vendor submitted an invoice or remittance claim to the company. Also, UMC's balance sheet, which is provided to UMC's board of directors and to the SEC for public disclosure, includes a line item for "debt." Mr. Devejian admitted that UMC did not include as "debt" the amount of unbilled escalation. Although UMC would never pay a vendor more than the invoice cost, and although UMC did not treat the unbilled escalation as a cost, UMC nonetheless claimed those amounts as actual increased material costs from the government in the June 11, 1992 claim submitted to the contracting officer.

Mr. Devejian acknowledged that FAR 31.205–26 applied to UMC's June 11, 1992 claim submission and was encompassed in his representation to the contracting officer that UMC was in "full compliance with the applicable standards of [FAR Part 31]." FAR 31.205–26 states in pertinent part that:

When materials are purchased specifically for and are identifiable solely with performance under a contract, the actual purchase cost of those materials should be charged to the contract.

48 C.F.R. § 31.205–26(d).

Mr. Knowlton testified that invoices and canceled checks are considered cost or pricing data and that UMC was obligated to furnish cost and pricing date, even if UMC did not rely on that data. Mr. Devejian con-

---

17. It should be noted that, by the end of trial, Mr. Devejian lacked credibility in that his answers were often circuitous, evasive and inconsistent. The testimony quoted immediately above is indicative of Mr. Devejian's lack of responsiveness that undermined his credibility with the court and diminished the weight of his testimony.

ceded that invoices and canceled checks were readily available to him at the time he prepared UMC's June 11, 1992 claim. Mr. Devejian further testified that he did not provide invoices or canceled checks to the contracting officer, or make known to the contracting officer that such documents were available, although he tried to hide behind the fact that the contracting officer did not ask for them.[18] Although Mr. Devejian represented to the contracting officer that UMC's claim was based on its "actual costs" documented on its books and records, he admitted that he did not even look at UMC's material costs ledger, invoices, or canceled checks to prepare the increased material costs portion of UMC's June 11, 1992 claim.

Mr. Devejian testified that he relied on purchase orders and included amounts in the claim that he felt UMC would eventually owe to its vendors at the completion of the contract. UMC's breakdown of its increased material costs is found in Exhibit F, attached to its June 11, 1992 claim. This schedule contains no explanation that some of the claimed increased material costs are estimates of amounts vendors might eventually invoice to UMC. By comparison, Exhibit D to the claim, that addresses unabsorbed fixed burden, contains the explicit note under the heading "Released to Date" that states: "Based on Actual Costs and estimate to complete units Released to Date."

As discussed above, it is evident from a schedule prepared by Mr. Devejian, that several of UMC's vendors failed to deliver the full complement of parts required under their respective purchase orders: Thompson Saginaw Co. failed to deliver 102 brake packages;

Wallace Forge Co., forty-seven (47) pintle hooks; Stewart Warner Hobbs Co., forty-five (45) hour meters; A & M Instrument Co., twenty (20) ammeters (seven (7) of one type and thirteen (13) of another) and fifteen (15) voltmeters; and Eberhard Manufacturing, ten (10) positive door holders.[19] An audit by DCAA also concluded that UMC had not received all parts contemplated by its purchase orders and had not received invoices for all of those parts. Mr. Michaud, one of the government's auditors, testified that the audit determined that UMC nonetheless claimed from the government increased costs on those parts for which there were no invoices.

UMC has never been invoiced for these undelivered parts and has never paid its vendors for those parts, and thus, UMC has not recorded a cost for these undelivered parts. Nonetheless, UMC included in its June 11, 1992 claim alleged increases in costs on the parts that had not been delivered, had not been invoiced, and had not been paid for. UMC included the supposed increases on these undelivered parts under the heading of "ACTUAL" on its supporting schedule with no further explanation.

Mr. Knowlton testified that nowhere in the claim or supporting documentation did UMC explain that its claim for increased material costs included amounts that it projected it would owe vendors. Mr. Knowlton also testified that UMC never pointed this fact out in correspondence and discussions with him after the claim was submitted. Consequently, Mr. Knowlton testified that he was misled by UMC's repeated use of the term "actual" in its description of material costs increase in

18. In juxtaposition to Mr. Devejian's suggestion that UMC was not required to submit invoices and canceled checks to the contracting officer, the court notes that Instruction 3 of FAR 15.804–6, Table 15–2, states:

3. There is a clear distinction between submitting cost or pricing data and merely making available books, records, and other documents without identification. The requirement for submission of cost or pricing data is met when all accurate cost or pricing data reasonably available to the offeror have been submitted, either actually or by specific identification, to the contracting officer or an authorized representative. As later information comes into the offeror's possession, it should be promptly submitted to the contracting officer. The requirement for submission of cost or pricing data continues up to the time of final agreement on price.

48 C.F.R. § 15.804–6 (Table 15–2).

19. Mr. Devejian denied that UMC had the capability to generate computer records to show amounts that vendors had invoiced UMC: "Our system does not provide for that." However, as discussed below, Mr. Devejian provided a computer record of outstanding invoices to UMC's bankruptcy counsel in December 1992, about six months after UMC filed the June 11, 1992 claim with the contracting officer.

the narrative to the June 11, 1992 claim, by its heading of "ACTUAL" in Schedule 7 in support of its claim, and by UMC's reassurances in the July 9, 1992 letter that its claim was based on "actual costs incurred" in accordance with the FAR and its books and records.

The government first discovered that UMC's material costs claim was not based on invoices when Ms. Barney conducted her audit in January 1995. Ms. Barney also testified on cross-examination that after the government confronted UMC about this discovery, Mr. Devejian admitted to her that the use of the term "ACTUAL" in Schedule 7 in support of the material costs claim "was a mislabeling. It was a mistake."

UMC cites *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987), and *Nager Electric Co. v. United States*, 194 Ct.Cl. 835, 442 F.2d 936 (1971), for the proposition that purchase order obligations are appropriate support for equitable adjustment claims. The United States, however, has not stated that invoices are the only measure of costs for an equitable adjustment claim or that purchase orders are never appropriate. Instead, the government argues, and the case law supports, that actual costs should be the starting point for any inquiry and the court should look to the best evidence available, on a case by case basis, in order to determine such actual costs. In *Nager Electric Co.*, there were no invoices because no costs has been actually incurred since the type of valve originally required was deleted by a change order and the claim was intended to compensate, the contractor for deleted work. *Nager Electric Co. v. United States*, 442 F.2d at 946. In *Lisbon Contractors, Inc.*, the plaintiff did not rely on a purchase order rather "Lisbon submitted a letter from the supplier which stated that ... Lisbon would be liable only for a balance of $24,-348.93 on its account," and the court found that there was sufficient evidence of liability. *Lisbon Contractors, Inc. v. United States*, 828 F.2d at 768. Thus, the supplier's letter in *Lisbon Contractors, Inc.* was tantamount

to an invoice, or in other words, the plaintiff's claim included a statement by a vendor of the amount of liability owed for materials specially fabricated. Neither case supports UMC's argument that a prospective order or a purchase order is sufficient legal basis upon which to state an entire claim. In the instant case before the court, the contract was substantially completed and UMC had available as evidence virtually all (according to the government's uncontroverted audit document, over 99%) of the invoices it would eventually receive on the contract.

UMC contends that it properly based its claim on purchase orders and informed the contracting officer of this basis for the claim. In the opinion of this court, however, after hearing the testimony, reviewing the documents submitted to the court, and listening to the argument of counsel, the court disagrees. Under the Contract Disputes Act, the FAR, and the case law, UMC was required to provide complete and accurate cost or pricing data to support its claim, especially since it was available. Moreover, UMC repeatedly represented that its claim was based on "actual costs" and deliberately concealed the fact that its invoice costs were far less.[20]

Therefore, in the instant case, the court finds that "actual costs" are "invoice costs," under the concept of best evidence for determining actual costs as defined in the FAR and relevant case law. In the FAR, actual costs are defined as "costs incurred, as distinguished from forecasted costs." 48 C.F.R. § 31.001. A cost is "incurred" when a person becomes legally bound to pay. In *Barash v. Public Finance Corp.*, 658 F.2d 504, 510 (7th Cir.1981), interpreting the bankruptcy code, the court wrote: ("Construing 'incurred' to mean when a debtor first becomes legally bound to pay comports ... with the plain meaning of the word"). Moreover, in UMC's case, as testified to by Mr. Devejian, the invoices were "readily available" to the contractor. Although it was not proven at trial whether or not it might have been more

---

**20.** These representations appear in UMC's June 11, 1992 claim (UMC's increased material costs are based on "actual increases experienced"), in letters to the contracting officer ("UMC's claim

consists of actual costs incurred"), and in its complaint (UMC's claim is based on "actual cost records").

difficult task for UMC to analyze invoices rather than purchase orders prior to submitting the claim to the contracting officer, the degree of analytical difficulty does not explain away the fact that UMC did not utilize the best and readily available evidence, and did not indicate that it was ignoring the best and readily available evidence.

In the case of goods and materials, payment becomes legally binding when the materials are delivered, not when the purchase order is signed. *See UIC, Inc. v. Plaintiff Committee of Creditors Holding Unsecured Claims of Powerine Oil Co. (In re Powerine Oil Co.),* 126 B.R. 790, 793 (9th Cir. BAP 1991) ("delivery is the event which triggers the debtor's obligation to pay and caused the debtor to incur the debt"); *In re Gold Coast Seed Co.,* 751 F.2d 1118, 1119 (9th Cir.1985) ("debt was incurred upon shipment . . . , and not when the debtor executed a contract agreement to purchase the goods in the future"). The cost incurred is the invoice cost, not the purchase order price, because purchase orders prove neither true cost nor actual delivery. *See Actco, Inc.,* ASBCA No. 14975, 73–2 BCA ¶ 10,158, 1973 WL 1519 (1973).

At trial, Mr. Devejian agreed with the FAR definition of "actual costs." UMC's accounting system is also consistent with this definition and Generally Accepted Accounting Principles. UMC does not record a cost until materials are delivered and invoiced. The cost that is recorded is the invoice cost, even though invoices must match the purchase orders.[21] In its bankruptcy filing, UMC identifies the date on which it "incurred" debt to its vendors as the invoice date, not the purchase order date.

UMC argues that it has a continuing obligation to its vendors for unbilled escalation. UMC's expectation that it may someday owe its vendors more than invoice cost is not legally controlling. *See Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042

(Fed.Cir.1994). UMC's attempt to distinguish *Young–Montenay* focuses on the fact that the contractor, Young–Montenay, submitted an altered invoice and UMC did not. Although it is true that Young–Montenay submitted an altered invoice, the act of altering an invoice was not the essential element of the contractor's misconduct. The critical act was that the contractor submitted a claim based on an amount the contractor knew exceeded its invoiced cost. Like UMC, Young–Montenay argued that it would someday owe its vendor the amount claimed. Nevertheless, the United States Court of Appeals for the Federal Circuit ordered forfeiture of Young–Montenay's claim under 28 U.S.C. § 2514, holding that:

> It was immaterial whether [Young–Montenay's representative] believed Young–Montenay would *subsequently* owe Keeler $153,000.00, for at the time of the submission of the invoice to the government, he knew Young–Montenay then owed Keeler only $104,000.00.

15 F.3d at 1042 (emphasis in the original). Certainly, the outcome of *Young–Montenay* would have been the same if the contractor withheld the invoice (without alteration), but claimed an amount exceeding the invoice price without identifying that fact or explaining it—*which is exactly what UMC did.*

UMC's continuing obligation argument also must be rejected on the facts. First, Mr. Devejian testified at least three times that he "can't imagine" paying more than invoice price (unless sued or subject to a claim in bankruptcy court, neither of which has occurred here). Second, UMC argues that it has an obligation to pay vendors even for materials not delivered. This is not the law, which is precisely why UMC would not pay more than invoice price unless sued or subject to a perfected bankruptcy claim. Moreover, the fact that in practice UMC did not pay for materials not delivered indicates that UMC is presenting purchase orders that

---

**21.** Significantly, many of the purchase orders do not even specify a sum certain for escalation, instead they merely authorize the vendor to invoice up to a "maximum" of a given amount or rate. The vendor is not bound to charge the maximum anymore than it is barred from giving a discount, further demonstrating that purchase orders are not evidence of actual cost. Note that the FAR requires contractors to credit the government for the amount of any benefit accruing to the contractor as the result of a reduction from the purchase order price to the actual invoice cost. *See* 48 C.F.R. § 31.201–5.

have little credence even to UMC. In addition, any obligation to vendors not in dispute or at issue in the bankruptcy court, are extinguished by the doctrine of accord and satisfaction. *See also Chesapeake & Potomac Telephone Co. v. United States*, 654 F.2d 711, 716, 228 Ct.Cl. 101, 108 (1981).

UMC's lack of good faith, under the circumstances of this case, in pressing its continuing obligation argument is apparent to the court. This court recognizes that a contractor may claim future expenses; however, when a contractor submits a claim that includes future expenses, projected costs should be in good faith and in compliance with the FAR, and identified as not yet incurred, especially when the costs have been identified as "actual costs." When a contractor claims future costs, the contractor must explain its "estimating process," including any "judgmental factors" applied and "contingencies." 48 C.F.R. § 15.804–6 (Table 15–2, Instruction 2). In addition, the contractor must submit all cost or pricing data reasonably available at the time of the submission, either actually or by specific identification, whether or not the contractor relies on such data. 48 C.F.R. § 15.804–6 (Table 15–2, Instruction 3). The rationale behind these requirements is consistent with the purpose of the Contract Disputes Act to provide a "fair" and "balanced" system to resolve contract claims by "equaliz[ing] the bargaining power of the parties when a dispute exists." S.Rep. No. 95–1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235. This court finds that UMC eliminated the government's opportunity to negotiate a fair resolution of UMC's claim by misrepresenting that its claim was based on actual costs; by concealing that its claim included future costs, estimates, judgmental factors, and contingencies; and by withholding its invoice costs, and other cost or pricing data.

UMC attempts to bolster its argument that invoice data was not required or requested by the contracting officer to support the claim, by pointing to the June 19, 1992 letter in which the contracting officer, Jeffrey P. Knowlton, requests: "Quotes, bids, purchase orders/contracts, and correspondence." [22] However, UMC ignores the preface to this list:

> We cannot consider the request [for an equitable adjustment] without detailed cost and pricing data as outlined in FAR 15.804–6, Table 15–2.... This includes, but is not limited to ...

FAR 15.804–6, Table 15–2, requires the submission of cost or pricing data (instruction 2) and even cites "invoice prices" as an example of a basis for pricing material costs (Instruction 1). Mr. Knowlton asked for invoices by reference, if not by name. In fact, Mr. Devejian testified that he understood that UMC needed to supply all of the information, *i.e.*, cost or pricing data, required by that FAR 15.804–6, Table 15–2. Although Mr. Knowlton's June 19, 1992 letter identified examples of supporting documentation, Mr. Devejian testified that he understood that UMC was required to provide not just those highlighted documents, but everything required by the FAR.

Moreover, in response to Mr. Knowlton's June 19, 1992 letter, UMC stated in a July 1, 1992 letter signed by Mr. Devejian that "UMC's updated claim submitted to you on June 11, 1992 did contain a properly completed Form 1411 that complied with FAR 15,-804–6, Table 15–2." This representation was repeated in UMC's July 9, 1992 letter to the contracting officer. By reference to FAR 15.804–6, Table 15–2, Mr. Devejian represented that UMC had furnished all reasonably available cost or pricing data. The court finds that even if Mr. Knowlton had not asked for invoices, it would not have relieved UMC of its duty under the Contract Dis-

---

**22.** It also is not surprising that Mr. Knowlton would have mentioned purchase orders in his request to UMC for documentation, since both purchase orders and invoices would be necessary to verify a retrospective claim. First, purchase orders would be necessary to determine what the cost of the contract would have been without the delay. Second, a comparison of purchase orders with invoices would reveal if any additional charges were included in an invoice for which the government should not be held liable. During discussions and negotiations with the contracting officer and prior to the submission of the June 11, 1992 claim, however, UMC did not inform the contracting officer that its claim for material costs was based solely on purchase orders.

putes Act, the FAR, and the case law to provide them.

The July 1, 1992 letter further attached "detailed supporting data" for the summaries and exhibits· attached to the June 11, 1992 claim. In support of its exhibit summarizing its increased material costs, UMC provided a multi-page schedule, identified as Schedule 7. Schedule 7 contains a part-by-part comparison of UMC's alleged increased material costs suffered due to government-caused delay. On the left hand side of the page, the schedule contains a column with the heading "W/O DELAY." Mr. Devejian testified that the totals under that column for each part represented the cost UMC would have incurred had there been no delay on the contract. On the right hand side of the page, the schedule contains the heading "ACTUAL." Mr. Devejian testified that the totals on the "ACTUAL" side of the schedule represented the cost that UMC actually incurred as a result of the delay.

As late as December 1994, Mr. Devejian continued to represent that UMC's increased material costs claim was based on actual costs. At that time, Tracy Barney, an auditor with the DCAA, testified that Mr. Devejian told her at the audit entrance conference that the material cost portion of the claim was based on actual costs. Ms. Barney contemporaneously recorded that statement in her diary. Therefore, it is apparent to the court that UMC's statement that Mr. Knowlton did not request invoices is an unsuccessful attempt to explain away both the FAR requirements and the contracting officer's request for all cost and pricing data.

UMC states in its brief submitted to the court that it had made a "valiant effort[ ] to identify purchase orders as the rationale and complete support for the increased material costs." Nevertheless, UMC admits that nowhere in its claim did it explicitly state that its increased material costs were based on purchase orders. Significantly, UMC's September 27, 1990 claim, unlike its June 11, 1992 claim, complied with the FAR by including cost or pricing data; namely, invoiced material costs for the five months of production experienced at the time of the claim. Not withstanding these facts, UMC points to references in the June 11, 1992 claim's Exhibit F, Schedule 7, and two letters written by UMC in response to the contracting officer's request for ·additional information, to demonstrate the submission of backup data. None of UMC's references, however, make clear that UMC's claim includes amounts which were never invoiced or paid by UMC.

UMC argues that claim Schedule 7 clearly identified purchase orders, and not invoice costs, as the basis for its claim. The schedule purports to be a schedule of UMC's increased costs due to delay. The left hand side of the schedule is labeled "W/O DELAY," representing what UMC's costs would have been without the delay. The right hand side of the schedule is labeled "ACTUAL." It is the court's finding that the only reasonable interpretation of this label is that the right hand side of the schedule labeled "ACTUAL" represents UMC's incurred actual costs with the delay. The reference to purchase orders on the "actual" side is reasonably understood as a method of tracking costs, as testified to by Mr. Knowlton and Ms. Barney. It would be reasonable to use purchase order numbers to track actual costs rather than invoice numbers, because there are as many as 20 to 40 invoices for each part but only one purchase order. It would not be reasonable, however, to label a column in a schedule of costs "ACTUAL," if the costs claimed did not represent those actually paid by the plaintiff. A delineation, in accord with earlier claim submissions by UMC on May 11, 1990 and September 27, 1990, that state "actual" versus "projected" costs is reasonable, and more significantly, not deceptive.

Schedule 7 also should be read within the context of the claim narrative which explicitly states that "UMC's claim for increased material costs is based on the *actual increases experienced* during the delay period." (em-· phasis added). The only logical meaning of this claim methodology is that Schedule 7 purported to show UMC's actual cost increases. In addition, given Mr. Devejian's admission that unbilled escalation is not an actual cost, there is no support for UMC's assertion that Schedule 7 identified the purchase orders as the basis for its claim.

It is the court's finding that UMC's claim for costs on 2,487 units did not inform the contracting officer that its claim was based on purchase orders. At the time UMC submitted the June 11, 1992 claim, it had shipped only 2,343 of the 2,487 units released under the contract. UMC contends that since the claim was based on the entire 2,487 units, it must have been "obvious" that the claim was based on purchase orders rather than actual costs. To the contrary, this court concludes that UMC changed its interpretation between the submissions of May 10, 1990 and September 27, 1990, as opposed to the June 11, 1992 claim, of "actual costs incurred" (from invoice based to purchase order based) without informing the contracting officer.

The fact that UMC had not completed shipment to the government does not mean that UMC had not taken delivery of all the parts and, therefore, knew its actual costs. In reality, shipment of finished units to the government reveals nothing about the status of vendor deliveries and invoicing. According to Mr. Bishop, on April 1, 1992, more than two months before UMC submitted its claim, UMC was only eighteen (18) work days away from completing the contract. Therefore, it is logical that UMC should have received all or virtually all the parts in-house by June 11, 1992. Consequently, a claim for the entire 2,487 units would not have put the contracting officer on notice that the methodology for determining actual incurred material costs was based on purchase orders.

Moreover, Mr. Devejian's own schedules prove that the number of units shipped to the government is unrelated to vendor deliveries and invoices. For example, Mr. Devejian's schedules show that by June 11, 1992, UMC had received and been invoiced for all 2,487 relays and slam paddle locks. The fact that UMC's own schedules reveal that they had already received parts for the full number of units claimed undermines any suggestion by UMC that the number of units shipped to the government should have informed contracting officer that the claim was based on purchase orders and not actual invoiced costs.

It is the finding of the court that UMC has contrived to find some "evidence" that it had informed the contracting officer of the basis of its claim. Moreover, it certainly would not have been difficult for UMC to indicate and state with equivocation that the equitable adjustment claim was premised upon purchase orders. In addition, UMC cannot escape the omission of cost or pricing data that is required under the FAR and was requested by the contracting officer, namely invoices and canceled checks, which appears to have been purposeful in order to prevent a meaningful comparison of actual versus projected material costs. UMC pushes beyond the limits of reasonable government contractor practice when, given the documents submitted to the contracting officer, to assert that the June 11, 1992 claim was based upon "actual increases experienced."

## II. UMC's Filings in the United States Bankruptcy Court

As part of its obligations in the bankruptcy court, UMC filed certain schedules to establish its assets and liabilities. The truth and accuracy of those schedules was certified to by Mr. Bishop, UMC's President, subject to penalties for making false statements or concealing property. Among the schedules filed by UMC was "Schedule F, Creditors Holding Unsecured Non–Priority Claims." This schedule required UMC to list each of its unsecured, non-priority creditors and the amounts owed to those creditors.

According to Mr. Devejian, the amounts listed as owing to UMC's material vendors in UMC's bankruptcy filings are the unpaid invoices listed on the cash flow report, based on a computer generated printout produced by Mr. Devejian. The amounts listed as owing on UMC's Schedule F bankruptcy filing did not include amounts for unbilled escalation. Similarly, it does not reflect amounts owed to vendors for parts that were never delivered and for which invoices were not received. Mr. Devejian also conceded that UMC did not claim on its Schedule F that it owed Teledyne for the $72,065.00 ($35.00 per base engine on the first 2,059 engines) that had been the subject of the pricing dispute in which UMC ultimately prevailed. Significantly, despite extensive legal argument in this court, it is apparent to the court that

UMC did not consider the amounts at issue in the Teledyne dispute, as to base engine price, to be UMC's debt because it did not include the amount in either its original bankruptcy filing or the amended filing that was filed two weeks after this court granted the government's motion for leave to file a fraud counterclaim against UMC.

Plaintiff suggests that the lack of resolution in the bankruptcy proceeding is indicative of the continuation of the Teledyne engine price dispute that was reserved under the invoices submitted to UMC. However, the suggestion that Teledyne is still pursuing, or may pursue further, the engine price dispute in the bankruptcy proceedings is not accurate under the procedures for filings in the bankruptcy proceeding. Under court order, and pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3) (1988), the bar date for "the time within which proofs of claim or interest may be filed" in UMC's bankruptcy proceeding was March 28, 1993.[23] Teledyne elected not to file a proof of claim before or after this date. In addition, because the bankruptcy schedule fails to indicate that the amount owed by UMC is disputed (nor contingent or unliquidated), Teledyne is limited to the $231,405.70 listed in UMC's schedule which reflects invoiced amounts (and does not include unbilled escalation).[24]

Alternatively, even if, as UMC's president Mr. Bishop asserts, UMC suggested that a "set-off" is the same as a disputed claim, there remains no basis for the argument that the amount of Teledyne's claim is not resolved or solidified in the bankruptcy proceeding. If UMC had marked its debt to Teledyne contingent, unliquidated, or disputed, the effect of Teledyne's failure to file a proof of claim in the absence of excusable neglect would have been to reduce its debt, perhaps to zero, since the "failure to file a timely proof of claim, unless the claim is 'deemed' filed, results in the creditor's not

**23.** Federal Rule of Bankruptcy Procedure 3003(c)(3) states that for chapter 11 bankruptcy proceedings such as UMC's, the bankruptcy court "shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed." Far from being insignificant, this deadline, or "bar date," is to be strictly enforced. 4 *Collier on Bankruptcy* ¶ 501.02[5][b][i] (15th ed.1996). "If a creditor in a chapter 11 case does not file a proof of claim prior to the bar date ..., the creditor usually must establish 'excusable neglect' under Federal Rule of Bankruptcy Procedure 9006(b) before the claim can be allowed." 4 *Collier on Bankruptcy* ¶ 501.02[5][b][i]. "A claim or interest must be 'allowed' for its holder to participate in the distribution of the debtor's assets...." 4 *Collier on Bankruptcy* ¶ 501.01[21][b]. "Failure to file a timely proof of claim, unless the claim is 'deemed' filed, results in the creditor's not being treated as a creditor with respect to its claim for purposes of voting on a plan and distribution of dividends." *Id.* (footnote omitted). Claims are "deemed" filed if they are listed in the debtor's schedule of creditors, with the exception of those claims which are listed as disputed, contingent, or unliquidated. 4 *Collier on Bankruptcy* ¶ 501.01[3][c]. "Thus, holders of claims or interests who do not disagree with the way their claim or interest is described in the schedules, and whose claim or interest is not listed as disputed, contingent or unliquidated, are spared the trouble of filing a proof of claim in a chapter 11 case." *Id.* On the other hand, "[a]ny creditor (or interest holder) disagreeing with the amount or status accorded by the schedules to its

claim or interest should also file a proof of claim or interest. Otherwise, the schedules of the debtor will control the extent of participation in the case for purposes of voting and distribution." 4 *Collier on Bankruptcy* ¶ 3003.03[3].

**24.** The bar date in UMC's bankruptcy proceeding was March 28, 1993. Teledyne elected not to file a proof of claim either before or after this date. Since any claim Teledyne might have for unbilled escalation would be based on facts which occurred well before the bar date, and these facts were well known to Teledyne at that time, it is unlikely that Teledyne could establish "excusable neglect" to file a late claim. UMC has presented an argument that Teledyne could file a proof of claim at a later date, and perhaps even today, pursuant to *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), in which on the facts of that case, plaintiff was able to qualify for an excusable neglect exception on the bar date for filing a proof of claim. This is not a plausible argument, however, because the application of the doctrine of "excusable neglect," although equitably construed, does not eliminate the bar date for proof of claim filings. *See New York Seven–Up Bottling Co., Inc.*, 153 B.R. 21, 23 (Bankr.S.D.N.Y.1993) (discussing *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74); *see also United States v. Waindel*, 65 F.3d 1307, 1308 (5th Cir.1995) (noting equitable consequences for untimely filed claims); *United States v. Vecchio*, 20 F.3d 555, 559–60 (2d Cir.1994).

being treated as a creditor with respect to its claim for purposes of voting on a plan and distribution and dividends." 4 *Collier on Bankruptcy* ¶ 501.01[2][b] (footnote omitted). UMC, however, placed in the bankruptcy schedule column, normally reserved for contingent, unliquidated or disputed (*i.e.,* "C," "U," "D"), an "S" to represent "setoffs." On the other hand, Mr. Bishop suggests that "S" could mean disputed in which case Teledyne would have been required to file a proof of claim—a decision that Teledyne has elected not to submit, and thus, would be without equivalent priority.[25] *See United States v. Waindel,* 65 F.3d at 1308. It is apparent, from Teledyne's lack of action, that even Teledyne does not believe "set off" is the equivalent of disputed. The fact remains that a claim is deemed filed unless listed as disputed, contingent or unliquidated, 4 *Collier on Bankruptcy* ¶ 501.01[3][c], therefore, the presumption is that Teledyne had no need or desire to challenge the amount presented by UMC as owed to Teledyne. The logical conclusion, as their lack of action demonstrates, is that Teledyne no longer disputes the base price for the engines, contrary to UMC's repeated assertions.

Mr. Devejian testified that the amounts listed as owing to UMC's material vendors in its bankruptcy claim, differs from the higher amounts sought from the government for the same vendor debts, because UMC's bankruptcy counsel insisted on a different methodology, *i.e.,* unpaid invoices to determine vendor debts. However, Mr. Devejian's testimony is totally contradicted by the testimony of Thomas S. Marrion, UMC's bankruptcy counsel. Mr. Marrion testified that he left it to UMC to determine who its creditors were and what amounts were owed those creditors. Mr. Marrion also recalled that he left to UMC the decision as to where on UMC's books and records to look to determine how much the vendors were owed. Most importantly, Mr. Marrion testified that he would never advise a client not to include in its

Schedule F filing a debt that the client believed in good faith to be owing.

In addition, Mr. Devejian testified that UMC's bankruptcy counsel, Thomas Marrion, specifically requested an accounts payable list to determine UMC's debts to its unsecured, non-priority creditors. According to Mr. Devejian, he produced a computer printout of a cash flow report that served as all accounts payable ledger at Mr. Marrion's request. Mr. Devejian conceded that the cash flow report that listed unpaid invoices to material vendors was available to him when he submitted the June 11, 1992 claim to the government, but he did not refer to it in preparing that claim.

Mr. Devejian further testified that if he later became aware that UMC owed a vendor an amount of money, he would amend the bankruptcy schedule and include that amount as a debt on its Schedule F. Significantly, as discussed above, UMC did not consider the once disputed Teledyne amount to be a debt of the company because it did not include the amount in either its original bankruptcy filing or its amended filing. Equally telling, Teledyne has not filed a proof of claim for the additional $35.00 per base engine for which it never billed UMC pursuant to the resolution of their dispute. Also, none of the other vendors on the floodlight contract has to this day claimed amounts in bankruptcy for unbilled escalation or for undelivered parts. Mr. Devejian testified that it was UMC's policy to timely pay its obligations. Mr. Devejian also testified that he would expect any good business to aggressively pursue amounts owed to it. UMC attempts, but cannot avoid the significance of the methodology or the documentary source for determining amounts outstanding to creditors selected by UMC in filing its bankruptcy claim. Nor can UMC escape the actual amounts of debt acknowledged by UMC in these same bankruptcy filings.

**25.** UMC argues that the "setoff" designation is sufficient to indicate a disputed amount. The court recognizes that an amount owed subject to setoff is relevant in a bankruptcy proceeding, however, UMC is unpersuasive when suggesting that a setoff is synonymous with a disputed claim. The cases that UMC cites while arguing

this point were all related to actual disputed amounts, not an amount subject to setoff. Simply stated, if UMC viewed these amounts as disputed it is apparent to the court that it would have so indicated, rather than by indicating an amount was subject to a setoff.

In a brief filed by the plaintiff with this court, UMC attempts to escape the damaging evidence in the bankruptcy court record by stating that "[t]here is no relationship between UMC's claim and its bankruptcy court schedule" of debt, that its bankruptcy filings cannot be used as admissions against UMC in the instant action in the United States Court of Federal Claims, and that since debtors and creditors may amend their filings at any time, present filings prove nothing. However, it is evident to the court that the proceedings and filings in the bankruptcy action are relevant to the claim presented to the government. UMC's claim seeks increased costs due to alleged government caused delay. These increased costs equal the amounts UMC either paid or owes its vendors attributable to the delay. In bankruptcy court, UMC filed a schedule of debt owed to its vendors and other creditors. Therefore, both the claim and the bankruptcy schedule address debts owed. Together, they address the universe of UMC's costs: those paid and those owed. It follows that if UMC neither paid its vendors unbilled escalation (which UMC admits), nor owes them for these amounts (as documented in UMC's bankruptcy schedule), then UMC's claim asserting entitlement to those costs is at a minimum inconsistent and an indication of fraud.

UMC tries to obscure the obvious by referring to the amounts in its bankruptcy schedule as "trade payables as of the date of bankruptcy." Nevertheless, the fact is that UMC's bankruptcy schedule is a statement of its debt based on unpaid invoices. These invoices do not include unbilled escalation. Moreover, the evidence is overwhelming that UMC has never really believed that it owes its vendors unbilled escalation. For example, UMC's bankruptcy lawyer, Thomas S. Marrion, testified that he left it to Mr. Devejian to determine the amount of UMC's vendor debt, and that he would never prevent a debtor from listing as a debt any amount the debtor truly believed it owed. In the bankruptcy filings, Mr. Devejian chose to assess UMC's debt based on unpaid invoices, which is consistent with Mr. Devejian's repeated statements at trial that he "can't imagine" paying more than invoice cost unless sued or subject to a claim in bankruptcy court. Unfortunately for UMC, this is inconsistent with the plaintiff's claim filed and pursued with the contracting officer.

■ The court is convinced that UMC's bankruptcy filings are admissions. Quoting *Collier on Bankruptcy* out of context, UMC points to language that states "the amount of a debt given in a schedule may not be taken as a judicial admission, since 'schedules are often prepared in haste without much thought being given to the values reflected therein and the possible consequences of such statements of value.'" 4 *Collier on Bankruptcy* 521.08[2][a] (quoting *In re Cobb*, 56 B.R. 440, 442 (Bankr.N.D.Ill.1985)). UMC neglects to point out that this statement is made in a paragraph describing the evidentiary effect of a debtor's schedule "in an adversary proceeding to determine the dischargeability of the debt." 4 *Collier on Bankruptcy* 521.08[2][a]. The evidentiary effect of such schedules in independent proceedings, such as this one, however, is discussed in the following paragraph:

> The Federal Rules of Evidence, in keeping with the mainstream of American evidence law, treat prior statements of parties that are not "judicial admissions" as being nevertheless "evidentiary" or "evidential admissions," which are admissible at the behest of an adversary in litigation. Thus, in an independent proceeding, a debtor's filed schedule has no other force against the debtor other than as an admission.

*Id.* (footnotes omitted). Therefore, UMC's original bankruptcy schedule, which does not include a single penny of unbilled escalation in the amounts owed to its vendor creditors, may not be a "judicial admission," but it may indeed be used by this court as an evidentiary admission. A debtor's statement in a bankruptcy schedule is an admission which is undiminished by the debtor's alleged ability to amend the schedule.

Finally, UMC's argument that it prepared the bankruptcy schedules in haste or without thought is simply not credible. Mr. Devejian was responsible for both the material costs claim to the government and the bankruptcy schedules, yet in determining the same liabil-

ity he utilized radically different theoretical methodologies. Specifically, in the bankruptcy schedule, material costs were based upon invoices which resulted in a debt stated as less than that reflected in the amounts claimed in the June 11, 1992 claim to the contracting officer that was based upon purchase orders. In other words, Mr. Devejian, as UMC's controller, sought greater funds from the government to pay vendors than UMC claimed were due to these same vendors in the bankruptcy court filings. The inconsistency in the methodologies does not suggest haste or lack of careful thought, but, rather, a deliberate attempt to present material costs in different fora in a manner most favorable to UMC. This is evident in the fact that UMC elected to disregard the entirety of the allegedly extensive efforts to measure material costs presented in the June 11, 1992 claim, and only, roughly six months later, elected instead to undertake a radically different analysis in preparing the bankruptcy schedules in December of 1992. This abrupt change in methodology was known by UMC, and is yet another indicia of fraud.

### III. The Government's Fraud Counterclaim

UMC's false and misleading statements were all designed to hide the simple fact that UMC has claimed in submissions to the contracting officer, and continues to claim in the complaint filed in this court, over $223,500.00 in material costs (including burden) that its vendors never invoiced and UMC never paid. UMC arrived at its calculation of material costs presented in its June 11, 1992 claim by using purchase order prices rather than the actual invoices received from its suppliers. A portion of this sum is attributable to unbilled escalation on delivered parts—amounts authorized by purchase order agreements but not included in the invoices issued by the vendors. The remainder is attributable to unbilled escalation on undelivered parts, for which UMC was never invoiced.

In the more than five years since UMC submitted its June 11, 1992 claim and received the final invoices issued by vendors up to the time of trial, no vendor has ever made a claim for unbilled escalation or demanded

payment for undelivered parts, nor would any claim be legally viable. Even so, UMC continues to demand this $223,500.00 windfall from the government under the guise of "actual increases experienced" and some theory of purchase order "obligation." The fact that UMC asserts this "obligation" to vendors not only for unbilled escalation on delivered parts, but also for undelivered parts, underscores the untenable posture that UMC has adopted. And while UMC asserts that these amounts are "obligations" entitled to reimbursement from the government, it did not identify the very same amounts as "obligations" owing when UMC filed its schedule of liabilities in bankruptcy.

UMC makes numerous affirmative representations as to the basis of its increased material costs in its June 11, 1992 claim; in its July 9, 1992 letter to the contracting officer in response to a request for additional data in support of that claim; and in its complaints against the United States in the bankruptcy court and in this court. These statements consistently represent that UMC's claim for increased material costs is based on "actual costs."

For example, UMC makes two clear representations in its June 11, 1992 claim. The first is in the narrative to the claim that identifies the claim methodology:

> the delay under this contract has caused UMC to incur increased material and direct labor costs.... UMC's claim for increased material costs is based on the actual increases experienced during the delay period.

Another representation is in the supporting data to the June 11, 1992 claim in which UMC breaks down its material costs, part by part Exhibit F, Schedule 7. The left-hand side representing the without-delay costs is labeled "W/O DELAY." The right hand side representing the with-delay costs is labeled "ACTUAL." Similarly, in the July 9, 1992 letter, UMC represents that its claim consists of "actual costs incurred." At trial, Mr. Devejian confirmed that this statement applied to all components of UMC's claim, and no exceptions were noted for material costs. Another example is in the adversary complaint filed in the bankruptcy court and in

the complaint filed in this court following the bankruptcy court's dismissal of the claim. Both complaints contain an identical paragraph stating that UMC's claim was based on "actual cost records."

The terms "actual costs" and "actual costs incurred" are not ambiguous terms. "Actual costs" are defined in the FAR as "amounts determined on the basis of costs incurred, as distinguished from forecasted costs." 48 C.F.R. § 31.001. Far from being ambiguous, this definition comports with common sense that costs incurred are actual costs and that forecasted costs are not actual, but rather projected. *See also United States v. Race,* 632 F.2d at 1120.

At trial, Mr. Devejian admitted that UMC's material costs claim submitted to the contracting officer is based in part on forecasted costs. Given this acknowledgment and the FAR definition of "actual costs," a reasonable person would, and this court does, conclude that actual costs means based on vendor invoices received from UMC's suppliers, or other form of proof of delivery and payment, but not on the earlier issued purchase orders, which might not have been fully or even partially filled, or accurately reflect material price because of escalations and decreases in price, or rate indices. In his testimony, Mr. Devejian offered confirmation:

Q: Mr. Devejian, I believe we read from your deposition testimony earlier that unbilled escalation is not itself an actual cost that is recorded on U.M.C.'s books.... I believe you agreed with that. Is that not right?

A: That's right. It's an obligation, but it's not recorded as such until the services or the goods are received or performed.

In addition to actual costs, UMC affirmatively misrepresents several other aspects related to its claim. In the July 9, 1992 letter, UMC represents that its claim consists of "actual costs incurred which are fully documented in its books and records." Similarly, UMC's complaints here and in the bankruptcy court represent that its claim is "based on UMC's actual cost records." But UMC's claim is not based on its actual cost records.

In an attempt to conceal UMC's misrepresentations, during his trial testimony, Mr. Devejian often refused to answer questions and crafted long-winded explanations which, nevertheless, exposed UMC's fraud. For example, government counsel began a line of questioning by asking Mr. Devejian if it were true that, "in accordance with Generally Accepted Accounting Principles, U.M.C. did not record something on its books until it received a valid invoice for it." Mr. Devejian responded:

A: Not necessarily.

Q: Under what circumstances would U.M.C. record something other than an invoice on its books?

A: U.M.C.'s obligation under purchase orders is reflected in the company's books.

Q: It's your testimony that U.M.C.'s obligations under purchase orders were reflected in the company's books? That's something that you're saying would be recorded as a cost on U.M.C.'s books?

A: It is necessary to recognize the obligation under purchase orders for contract costing purposes, when determining inventory and cost of goods sold.

\* \* \* \* \* \*

Q: Mr. Devejian, those costs that are reflected on U.M.C.'s books are U.M.C.'s actual costs incurred, correct.

A: It depends on which part of U.M.C.'s books you are referring to.

Q: On U.M.C.'s general ledgers and books of accounts, aren't those the actual costs incurred?

A: It's not a simple yes or no. Do you want me to explain?

Q: No, I just want to understand. Is it your testimony that U.M.C.'s actual costs incurred are not found on its general ledgers and books of account?

A: U.M.C.'s actual costs, invoiced costs? Is that what you're referring to.

Q: I'm using the term, actual costs incurred as U.M.C. understood that term.

A: Can you define for me what you mean by the word incurred?

Q: Mr. Devejian, can you say whether or not U.M.C.'s actual costs incurred [are] found on its general ledgers and books of account?

A: Well, can I answer it this way. There are certain parts of U.M.C.'s general ledgers and books of accounts that record the historical costs of invoices received, material costs.

Q: Let me—

A: There's another section of the books where the total purchase order cost is reflected.

Q: I'm asking you, as U.M.C. understood the term actual cost incurred, that amount was recorded on U.M.C.'s general ledger and books of account, isn't that a correct statement?

A: I'm not sure. I think we have to define what we're talking about in terms of the phrase, actual cost incurred.

Q: Let me again turn your attention to the deposition at page 55, beginning with line 22. Are you there, Mr. Devejian?

A: Yes, I am.

Q: The question at line 22 by Mr. Gust, "Are the actual costs incurred reflected on the documents that compare the actual results by month and quarter with the budget?" Answer, "The actual costs incurred are reported in many ways, including SEC reports, both quarterly and annually, as well as in our reports issued by our public accountants and, of course, from our general ledger and our books of accounts which DCAA had access to." That was a truthful statement, wasn't, Mr. Devejian?

A: Yes it is. In the context of which I was speaking, it was a correct statement.

Q: Further down at line 21, let's say at line 15, on page 56, you were asked,

"Do you understand the question?" Your answer was, "Yes, I understand the question and you are asking me to give you, to answer something that I have no idea what it is that you're referring to. I have already answered your question, and you seem to want to keep probing in that area. But, I'm sorry, I can't help you. Our actual costs are in our original books and records and general ledgers, which the auditors have seen and which have been produced a number of times through discovery." Correct?

A: Yes.

Q: Now, Mr. Devejian, among those costs recorded on U.M.C.'s books were those costs for material costs, correct?

A: Yes.

Q: That was a separate account on the general ledgers, right?

A: Among other accounts. There is an account called material costs on our books.

Q: Mr. Devejian, it was the policy of U.M.C. to timely pay its obligations, wasn't it?

A: Yes.

Mr. Devejian's response is telling for its evasions and explanations which attempt to skirt the plain meaning of the definition of the term "actual costs incurred" and the issue of whether those costs were recorded on UMC's books and records. Compare this testimony by Mr. Devejian to UMC's simple and straightforward statement in its July 9, 1992 letter that its claim consists of "actual costs incurred which are fully documented on its books and records."

Second, in order to validate UMC's claim, Mr. Devejian tried to find somewhere in UMC's "books and records" where purchase order "obligations," as he calls them, were recorded. Mr. Devejian states that they were recorded "for contract costing purposes, when determining inventory and cost of goods sold." However, it is apparent that these are not UMC's actual cost records, because Mr. Devejian admits that UMC's actual costs are recorded in the material costs account on the general ledger and only

invoice costs are reported on the general ledger.

Mr. Devejian's attempts to explain UMC's conscious misrepresentations to the contracting officer are further exposed by his earlier deposition testimony. There, Mr. Devejian clearly and unequivocally stated that: "Under Generally Accepted Accounting Principles, you do not record a cost on your books until you receive an invoice, a valid invoice for those costs." These representations all relate to UMC's compliance with the Contract Disputes Act and the FAR. Regardless of whether UMC was required to submit a Standard Form 1411 or cost or pricing data in accordance with FAR 15.804–6, Table 15–2, UMC affirmatively represented that its submissions were accurate and compliant with applicable law and regulation. Therefore, the issue for purposes of the government's counterclaims premised on fraud and misrepresentation is not whether the Contract Disputes Act or the FAR required UMC to submit a Standard Form 1411 or additional cost or pricing data, but whether having stated affirmatively that it had, whether those statements are true and the paperwork submitted was accurate. As demonstrated below, the Contract Disputes Act and the FAR both mandate that UMC submit a truthful Standard Form 1411 and cost or pricing data, and the evidence demonstrates that UMC intentionally circumvented its obligations.

As noted above, the purpose of an equitable adjustment claim is to make the contractor whole. *Bruce Constr. Corp. v. United States*, 324 F.2d at 518, and to provide a "fair" and "balanced" system to resolve contract claims. S.Rep. No. 95–1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235. As also discussed previously, the Contract Disputes Act requires that contractors certify that the supporting data submitted with the claim are "accurate and complete," 41 U.S.C. § 605(c)(1); FAR 15.804–2 requires the submission of "cost or pricing data;" and FAR 15.804–6 prescribes the procedural requirements for submitting such data. Congress also was concerned about submissions of unwarranted or fraudulent claims by contractors. Without com-

plete and accurate cost or pricing data, the government's bargaining position is severely compromised and the tax payer risks paying money for goods or services not receive. UMC violated the Contract Disputes Act and the FAR and intentionally placed the government in an inferior position by withholding its invoice costs. In addition, by withholding its actual incurred costs that are evident in invoices, UMC attempted to conceal the fact that payment of its claim would make UMC far more than whole, at the expense of the taxpayer by giving UMC a $223,500.00 windfall.

As testified to by the contracting officer, equitable adjustment claims submitted when a delay has occurred, but before performance of a contract, would appropriately be based on fundamental references, such as vendor quotes and purchase order prices. In fact, UMC in its earlier claims, submitted on May 10, 1990 and September 27, 1990, specifically stated that its forecasted material costs were based on vendor quotes and purchase orders. Moreover in those same claims, UMC carefully identified and delineated material costs derived from invoices (and identified these costs as "actual costs"), thereby demonstrating knowledge of the appropriate methodology for submitting a claim to the contracting officer. Logically, and as testified to by numerous witnesses at trial, equitable adjustment claims submitted in the middle of the contract should be a combination of actual costs incurred up to the time of filing and estimated cost based upon articulated judgmental factors for portions of the contract not yet performed, in accordance with FAR 15.804–6. *See* 48 C.F.R. § 15.804–6. Similarly, equitable adjustment claims submitted when performance is complete should be based on actual cost data. As noted by plaintiff's own expert, Darrel J. Oyer, these would include invoices and canceled checks.

By the time UMC submitted its June 11, 1992 claim, it had substantially completed performance on the contract and had received over 99% of the invoices on the materials it purchased. Therefore, UMC's claim should have been based primarily and overwhelmingly on invoice costs, rather than on purchase order prices. More significantly,

any deviation from the use of invoice costs, particularly future estimates, should have been disclosed and clearly identified in accordance with the requirements of the Contract Disputes Act certification and the FAR.

At the time of plaintiff's claim submissions, the Contract Disputes Act required contractors claiming equitable adjustments in excess of $50,000.00, to certify that the claim was made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1). As an experienced government contractor, UMC was aware of this provision and certified its June 11, 1992 claim. Mr. Devejian acknowledged that the contracting officer was entitled to rely upon the certification and additional statements of compliance made in the follow-up letters of July 1, 1992 and July 9, 1992. Mr. Knowlton testified that he did, in fact, rely upon the certification and the representations in the above-referenced correspondence from UMC.

 The Contract Disputes Act was enacted with a certification provision to discourage unwarranted contractor claims, to trigger liability for a fraudulent claim if one was submitted, and to empower the "complete and accurate" claim submission requirements with a provision to provide meaningful enforcement. The United States Court of Appeals for the Federal Circuit has described the certification provision as "one of the most significant provisions of the CDA." *Transamerica Ins.*, 973 F.2d at 1579 (quoting *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1384 (Fed.Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983)). Certifying an equitable adjustment claim is a serious matter, as Mr. Devejian testified to and understood. The issue then is what constitutes an adequate submission, specifically, in the words of UMC, one which provides "supporting data [that] are accurate and complete."

The procedural requirements for submitting a claim are set forth in the FAR. In particular, FAR 15.804–2 requires the submission of "cost or pricing data" whenever there is a "modification of any sealed bid or negotiated contract ..., when the modification involves a price adjustment expected to exceed $100,000." 48 C.F.R. § 15.804–2(a)(ii). Based on the record before the court, UMC understood that obligation.

FAR 15.804–6 sets forth the procedural requirements for submitting cost or pricing data and the format for such pricing proposals:

(b)(1) Cost or pricing data shall be submitted on Standard Form 1411 (SF 1411), Contract Pricing Proposal Cover Sheet....

(2) Contract pricing proposals submitted on SF 1411 with supporting attachments shall be prepared to satisfy the instructions and appropriate format of Table 15–2.

48 C.F.R. § 15.804–6. UMC submitted its June 11, 1992 claim under cover of a certified a Standard Form 1411, and affirmatively represented in its July 9, 1992 letter that its claim "fully complies with the applicable sections of the Instructions to Table 15–2." The mandatory language of FAR 15.804–2 (*i.e.*, "shall be submitted," "shall be prepared") clearly places the burden on the contractor to furnish the information, not on the contracting officer to request it, as suggested by UMC.

The a Standard Form 1411 itself contains a statement, directly above the signature line, that "This proposal ... reflects our best estimates and/or actual costs as of this date." The form accompanying UMC's claim is signed by Mr. Devejian and dated June 11, 1992. The instructions to Table 15–2 of FAR 15.804–6(b)(2), detail the structure and content of a claim, and dictate that if materials are an element of cost, the contractor must include the basis for pricing. In addition, the instruction provides examples of "vendor quotes, invoice prices, etc." 48 C.F.R. § 15.804–6 (Table 15–2). The contracting officer and other government representatives reasonably assumed that actual costs were the basis for UMC's increased material costs claim, because of the UMC's numerous references to "actual costs incurred" in the submission to the government. This was also a

reasonable assumption because of the prior claim submitted by UMC to the contracting officer that clearly distinguished forecasted costs from actual costs. Furthermore, as documented in the record, the invoices were available as reliable evidence of incurred costs. The purchase orders, on which UMC now argues it bases its claims, do not reflect "actual costs" simply by the inclusion of the purchase order numbers to identify materials.

Moreover, nowhere does UMC state that its claim was based on purchase order prices. Instruction 2 of Table 15–2, FAR 15.804–6, requires the submission of cost or pricing data:

2. As part of the specific information required, the offeror must submit with offeror's proposal, and clearly identify as such, cost or pricing data (that is, data that are verifiable and factual and otherwise as defined at FAR 15.801).

48 C.F.R. § 15.804–6 (Table 15–2). FAR 15.801 defines "cost or pricing data" as

all facts as of the time of price agreement that prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are factual, not judgmental, and are therefore verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

48 C.F.R. § 15.801.

Invoice costs are the model of cost or pricing data. They are "factual," "verifiable" costs that could be "reasonably expected to contribute to the soundness of estimates of future costs and to the validity of costs already incurred." *Id.* Cost or pricing data must be furnished. This requirement makes sense in light of the purpose of the Contract Disputes Act to "equalize the bargaining power of the parties when a dispute exists." S.Rep. No. 95–1118, 95th Cong., 2d Sess. 1

(1978), *reprinted in* 1978 U.S.C.C.A.N. 5235. UMC, however, fails to identify invoice cost or breakdown its claim into "invoiced costs plus an estimate to complete based upon the purchase orders," as Mr. Devejian described UMC's claim at trial. The methodology of UMC in the June 11, 1992 must be contrasted to UMC's submission of cost or pricing data in its September 27, 1990 claim, in which UMC identifies its submission of cost or pricing data by furnishing the actual cost of the materials, *i.e.*, invoiced costs available at the time of submission and distinguishes "actual" data from "projected" data by stating that UMC's demand for increased material costs is based on "projections." At trial, Mr. Devejian confirmed that the "actual" data in the earlier claim, which included data for incurred material costs, was based on invoice costs.

It is apparent to the court that UMC clearly understood the difference between actual, invoice costs and projected, future costs. The earlier claims proves that UMC knew how to submit and properly document a claim, but intentionally ignored the procedures in its June 11, 1992 claim. By purposefully withholding the invoice data and representing that its June 11, 1992 claim was based on actual costs, UMC attempted to deny the government the equal bargaining power that comes from being able to verify cost or pricing data and to question estimates, assumptions, and judgments. Indeed, UMC appears to have withheld this data intentionally, because UMC logically must have known that the contracting officer would deny the claim if he knew the real facts—that UMC's claim was based on purchase orders when actual data was readily available to show that UMC was claiming amounts its vendors never had billed, and probably never would bill, UMC.

UMC suggested at trial that a contractor has no obligation to submit complete and accurate cost or pricing data until an agreement on price or at the request of the contracting officer. This interpretation flies in the face of the plain language of the certification ("the supporting data are accurate and complete"), the a Standard Form 1411 ("This proposal ..., reflects our best estimates

and/or actual costs as of this date."), the requirement for the submission of cost or pricing data in FAR 15.804–6(b)(2), Table 15–2, Instructions 2–3 ("The requirement for submission of cost or pricing data continues up to the time of final agreement on price"), and the purpose of the Contract Disputes Act to equalize bargaining power. Data furnished after an agreement on price is too late to be of use in negotiations.

At trial Mr. Devejian tried to suggest that UMC's material costs claim "represents the sum total of invoiced costs plus an estimate to complete based upon the purchase orders, and that the sum of those two equal the total purchase order cost." Nowhere in UMC's claim, however, is this estimating process explained by UMC, as required by the FAR. Nor does UMC state in the methodology articulated to the contracting officer that it will eventually owe its vendors based on the purchase orders for amounts not invoiced. Incredibly, Mr. Devejian testified that UMC's determination that it owed vendors based on the purchase orders did not involve a judgment call, despite the fact that he testified three times that he "can't imagine" paying more than invoice cost, unless perhaps UMC were sued or the vendor filed a claim in bankruptcy court. Mr. Devejian evaded the government's questions as to whether this condition of payment on a vendor submitting an invoice, filing suit, or a bankruptcy claim is not a contingency.

Put into the context of his own remarks, it is not difficult to conclude that Mr. Devejian's testimony lacked credibility and was inconsistent. Mr. Devejian testified that UMC has an obligation to pay its vendors based on the purchase orders, most of which were executed in 1988 and 1989. He also stated that he "can't imagine" paying more than invoice cost, unless sued or subject to a claim in bankruptcy court. By June 11, 1992, when UMC submitted its claim, UMC had received over 99% of the invoices from its vendors. Specifically, based on the government's audit, before certifying its claim on June 11, 1992, UMC had on hand 720 of 721 invoices. When UMC submitted its claim on June 11, 1992, as prepared by Mr. Devejian, that claim included without explanation or identification uninvoiced amounts for escalation authorized in purchase order agreements, but never billed by many vendors. It also included amounts for escalation on parts never delivered to UMC. The court finds that Mr. Devejian and UMC intended to elevate or misrepresent, to the contracting officer and the United States, the incurred material costs associated with the contract at issue.

If fraudulent intent can be proved "by placing the questioned documents and statements alongside well-known and established facts," *Kamen Soap Products v. United States*, 124 F.Supp. at 620, 129 Ct.Cl. at 642, UMC's near contemporaneous submission of its claim to the contracting officer and its statement of debt in the bankruptcy court is an indicia of an intent to defraud the government. While UMC maximized its claim against the United States by basing its material costs on purchase orders, it minimized its liability to its vendors in the bankruptcy court by basing the very same liabilities on invoices. UMC only amended its bankruptcy schedules to attempt to remove a portion of their inconsistency after the government filed its fraud counterclaims, and even then neglected to "correct" the misrepresentation associated with Teledyne.

As discussed above, on June 11, 1992, UMC submitted its equitable adjustment claim to the contracting officer. Although not stated at the time, UMC now admits that the demand for increased material costs was based on purchase orders which UMC asserts represents its "obligation" to its vendors. Six months later, on December 11, 1992, UMC filed its schedule of unsecured creditors in the bankruptcy court (Schedule F—Creditors Holding Unsecured Nonpriority Claims). The purpose of this schedule is for a debtor to identify its creditors and to quantify the amounts the debtor believes it owes to those entities. In its schedule of unsecured creditors, UMC based its liability on unpaid invoices. Bankruptcy law defines "claim" in pertinent part as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (1994).

Consequently, at the time UMC filed its schedule of unsecured creditors in the bankruptcy court, UMC must have believed that its vendors had no claim or "right of payment" for unbilled escalation and undelivered parts. It follows that UMC believed it had no "obligation" to pay those amounts.

At trial, Mr. Devejian tried to cover up the disparity by shifting responsibility to UMC's bankruptcy lawyers. According to Mr. Devejian, he did not understand the schedules and was merely following the directions of the attorneys. However, as noted previously, the bankruptcy lawyer who prepared the schedules directly contradicts Mr. Devejian's testimony. Mr. Marrion testified that he never instructed Mr. Devejian on how to determine UMC's vendor debt. According to Mr. Marrion, that was left up to Mr. Devejian who, as UMC's controller, and based on his past experience, was highly capable of listing the company's debts. Moreover, Mr. Marrion testified that he would never prevent a debtor from listing as a debt any amount the debtor truly believed it owed. So, if UMC truly believed it owed its vendors monies for unbilled escalation and for parts not delivered, Mr. Devejian could have and should have listed them on the original bankruptcy schedule.

The nature of the documents filed in the bankruptcy proceedings themselves also flies in the face of UMC's attempt to shift responsibility. UMC president, E. William Bishop, declared under penalty of perjury on behalf of UMC that he had read the bankruptcy schedules and that they were true and correct to the best of his knowledge, information, and belief. Thus, Mr. Bishop certified that UMC's vendors had no claims against UMC, and that UMC owed no money to vendors, for unbilled escalation and undelivered parts. Similarly, also discussed above, UMC's bankruptcy court schedules, signed under penalty of perjury, constitute an evidentiary admission, see 4 *Collier on Bankruptcy* 521.08[2][a], that UMC did not believe its vendors had any claims for unbilled escalation or undelivered parts, or that it owed its vendors for these amounts; nevertheless, UMC claimed these amounts from the government six months earlier.

On November 8, 1995, UMC filed an amended bankruptcy schedule increasing its debt to eight of its vendors. UMC's timing in filing the amendment—just two weeks after the government received leave to file a fraud counterclaim in this court—makes it highly suspect and is relevant to demonstrate UMC's fraudulent intent. At least as early as June 1995, UMC recognized that: "In most cases, vendors failed to invoice UMC for escalation authorized in P.O.'s," meaning purchase order escalation clauses were not triggered and the associated material costs claimed are not found on invoices. As discussed at length in the facts, UMC's failure to amend its bankruptcy filings to include the escalated engine price never invoiced by Teledyne shows unequivocally that UMC never believed it owed Teledyne that amount. Accordingly, UMC's inclusion of that amount, specifically $87,045.00, was a knowing misrepresentation done with the intent to deceive the Government into paying an inflated amount.

In its June 11, 1992 claim, UMC unequivocally identified the material costs component of the claim as being based on "actual costs." It made this representation in the narrative to the claim, in the heading of the supporting schedule, and in subsequent correspondence to the contracting officer. UMC repeated these representations in the bankruptcy court, in its complaint before this court, and in the entrance audit conference held December 8, 1994, during DCAA's audit of UMC's claim. When UMC was challenged, or perhaps exposed, it shifted its characterization of its claim to "estimates." In a meeting that included Ms. Barney and Mr. Devejian, Mr. Devejian said that his use of the term "actual" had been a "mistake." At trial, Mr. Devejian described UMC's claim as based on "invoiced costs plus an estimate to complete," and on its "obligation" to its vendors.

Shifting representations are often the mark of fraud and dishonesty and UMC shifts in its characterization of its claim from "actuals," to "estimates," to "obligations," all in an attempt to cover up its fraud. As the case law shows, however, UMC should not be allowed to invoke these terms intermittently and without explanation "to justify a willful

attempt to fleece the system." *United States v. White,* 765 F.2d 1469, 1481 (11th Cir.1985).

The United States Court of Appeals for the Eleventh Circuit addressed similar issues in *United States v. White,* 765 F.2d 1469, in which the court affirmed the defendants' convictions for criminal false statements and false claims, 18 U.S.C. §§ 1001, 287, based on shifting representations made in an equitable adjustment claim during negotiations and at trial. In *United States v. White,* the defendants labeled its summary of costs as an "estimate," but represented in negotiations that the itemized expenses were actual costs. *Id.* at 1473–74. When the government discovered that the "actuals" were grossly inflated, the defendants reverted back to "estimates." The court affirmed the convictions, holding:

> In negotiating with the government, contractors cannot play both sides of the net, claiming during negotiations that their estimates reflect real costs, but then upon discovery of their falsity claim that they were indeed only rough estimates. Negotiation over change orders invariably must involve a great deal of give and take, with high and low figures; but these figures must be honestly arrived at and not knowingly inflated in a willful attempt to mislead the government as to actual costs incurred.

*United States v. White,* 765 F.2d at 1482. The defendants in *United States v. White* contended that they could not be convicted for fraud based on estimates, however, the court disagreed. In fact, the court noted the "deceitful manner" in which the defendants had presented the claim, *id.* at 1480, and the contractor's duty to make sure that estimates reflect reasonably incurred costs in a claim in which actual cost data is available:

> There is a line between estimates which reflect reasonably incurred expenses and estimates which are so grossly inflated when compared to actual costs that they are by their very nature fraudulent. That line has been crossed in this case. A review of the actual hours in this case demonstrates that the appellants' cost proposals were consistently overinflated, at times by 100 percent or more. All final

submissions of the cost proposals were made after the change work was completed. Appellants strenuously contend that this fact is of no consequence because the estimates were based solely on formulas using drawings and specifications. However, the evidence showed that timecards ..., daily logs and supervisor reports were readily available. Even if the estimates were truly based on mathematical formula, appellants had a duty to make sure that they reflected reasonably incurred costs. Checking available physical data on change orders was the obvious means to accomplish this end.

*Id.* at 1481–82.

In the instant action, it is apparent to the court that, similar to the defendants in *United States v. White,* UMC was deceitful in the manner in which it presented its claim. Moreover, as in *United States v. White,* UMC had physical cost or pricing data available to it to verify whether its claim reflected its reasonably incurred costs. In addition, as in *United States v. White,* UMC created a claim steeped in misrepresentation because UMC actually experienced a savings in material costs rather than an increase. The court takes notice that if such evidence was sufficient to affirm criminal convictions in *United States v. White,* 765 F.2d at 1481–82, for false statements and false claims, it likewise is sufficient to sustain a finding of civil fraud.

■ The court finds that UMC attempted to practice fraud against the United States in the proof, statement, and establishment of the June 11, 1992 claim submitted to the contracting officer, by deliberately inflating its demand for increased material costs allegedly incurred as a result of government-caused delay. UMC's claim is inflated by including amounts provided for in purchase order escalation clauses, namely unbilled escalation, again, neither billed by vendors nor paid by UMC, on delivered and undelivered parts. Moreover, the United States has proven that UMC's June 11, 1992 claim and the supporting data are false and deliberately misleading.

Simply stated, UMC's June 11, 1992, claim for increased material costs is not based on

"actual increases experienced." Actual costs in the instant case should have been derived from vendor invoices and contractor payments. UMC's claim is based on purchase orders, which were four years old at the time UMC prepared its claim, and was not based on readily available invoices and payment records. In addition, on February 16, 1993, UMC filed an adversary complaint in bankruptcy court, premised on its June 11, 1992 equitable adjustment claim that stated UMC's June 11, 1992, claim is "based on UMC's actual cost records for Fiscal (Calendar) Years 1988 through April, 1992." Thereafter, on November 19, 1993, UMC filed its complaint in the United States Court of Federal Claims, that states UMC's June 11, 1992, claim is "based on UMC's actual cost records for Fiscal (Calendar) Years 1988 through April, 1992."

It is the finding of the court that despite the representations UMC made in its June 11, 1992 claim to the contracting officer and in its complaints and statement filed in the bankruptcy court and in this court, UMC's claim is not based on its incurred actual costs, as reflected in its books and records. Instead, UMC's claims are based on purchase orders, even though the data required by the FAR (incurred costs as reflected in the contractor's books and records) was readily available to UMC at the time it submitted its claim to the contracting officer and to this court. It is the finding of this court that UMC deliberately failed to identify the purchase orders as the basis for its claim or the contingencies inherent in using the purchase orders, specifically, (1) that the vendors may never deliver the full complement of units ordered, and (2) that the vendors may never invoice for escalation.

The contract between the parties and the FAR set forth detailed requirements on how to structure a claim for an equitable adjustment. There is no doubt that Mr. Devejian, UMC's controller and chief financial officer, and the person who prepared and certified UMC's claims, was intimately familiar with this procedure. The only conclusion is that UMC knew how to file a claim and ignored it to conceal its fraud. For example, UMC's claims to the contracting officer were submitted on Standard Form SF 1411. Mr. Devejian knew that the FAR provision referenced in that form, FAR 15.804–6(b)(2) required UMC to base its claim for increased material costs for units already completed on incurred costs as reflected in its books and records. Mr. Devejian also knew that to the extent UMC's claim was for units in process or for future production units and was not based on incurred costs, FAR 15.804–6(b)(2) required UMC to separately identify, explain, and support estimates of such costs, including any judgmental factors applied and the nature of any contingencies. Nevertheless, nowhere in UMC's claim does it state that a portion of UMC's claim is based on costs not yet incurred for parts not yet delivered to UMC. In addition, UMC's claim failed to identify unbilled escalation as a contingent liability. To the contrary, UMC's June 11, 1992 claim states that UMC had "incur[red] increased material ... costs" and that it is based on "actual increases experienced." Also to the contrary, UMC's complaints in the bankruptcy court and in this court state that its claim is based on "actual cost records."

Ultimately, and contrary to repeated arguments in pleadings, at trial, and in its closing argument, UMC's precision in describing its claims belies inadvertent misrepresentation. UMC's representations as to the methodology and support for the June 11, 1992 are in sharp contrast to UMC's earlier claim submitted to the contracting officer on May 10, 1990 and September 27, 1990, in which UMC accurately described its claim for as being based on "actual costs incurred," and its claim for future production costs as being based on "projections" and "forecasts." UMC knew how to describe the correct bases for claims and could do so with precision, as the government has proven with clear and convincing evidence, and to which UMC has failed to present any contradictory evidence.

In every other context, when UMC used the term "actual" it meant actual cost as reflected in its books and records, not purchase order prices, e.g., in its early claims, in other portions of its June 11, 1992, claim, in bankruptcy court filings, in Security and Exchange Commission filings, and in discussions with DCAA. It is evident to the court

that UMC deliberately ignored readily available records accurately reflecting its actual incurred costs in favor of stale purchase order data. The facts are clear: UMC had received over 99 percent of its vendor invoices before submitting its June 11, 1992, claim; and UMC's books and records reflect actual invoice costs, not prices quoted in purchase orders. Nonetheless, UMC persists in basing its claim on stale purchase order data even though, unquestionably, by the time UMC filed its complaint in this court, UMC had complete and accurate cost data. The government has proven by clear and convincing evidence that UMC knew that its June 11, 1992 claim is based on parts that will never be delivered and escalation that will never be billed, not on "UMC's actual cost records" as represented in the complaint.

Exhibit 2015, as prepared by the government, compares UMC's claimed material cost increases to the actual cost of materials as reflected in the invoices. This exhibit is a summary of the entirety of the differentials between UMC's June 11, 1992 claim for alleged "actual costs incurred" and the actual invoice costs that UMC incurred. This exhibit reflects the government's claim for misrepresentation damages, in that Exhibit 2015 outlines the amount of misrepresentation that the government alleges UMC undertook in the above-captioned case. UMC attempted to attack the exhibit from a factual/mathematical standpoint, but only on certain aspects of the government's claim, and from a theoretical perspective.

At trial, UMC attempted to undermine the accuracy of the numbers reflected on the exhibit by pointing to the costs regarding the Teledyne dispute, and how the numbers on Exhibit 2015 for engine costs are different than those on both invoices and purchase orders. The testimony of the government's witness, Mr. Michaud, at trial and the note to

Exhibit 2015,[26] both demonstrate that although the purchase orders and the invoices include the base price of the engine plus the added cost of engineering changes, the United States was only liable for the increases attributable to the base price of the engine. In other words, Mr. Michaud in preparing Exhibit 2015 only incorporated the base price of the engine (after eliminating the engineering change costs). Notably, UMC did not challenge the mathematical or factual accuracy of the invoiced costs comparison for any of the other sixteen (16) parts that are listed on Exhibit 2015.

UMC also attacks the government's decision in creating Exhibit 2015 to cap the material costs at 2,487 units for each component part, or less in the event that UMC did not receive the maximum of 2,487 units of a particular component part. In other words, UMC complains that in some instances they overbought the requisite number of components (i.e., more than 2,487 pieces of a particular component part), however, the exhibit does not reflect the additional expenditure.

First, UMC is correct in stating that Exhibit 2015 does reflect that if the quantities received by UMC were less than 2,487 units, then only the actual quantities that were received were calculated on the exhibit. Second, UMC is also correct in stating that Exhibit 2015 reflects that in the event UMC received in excess of 2,487, namely "overbuys," then the actual costs are capped at 2,487 units.

The premise of the argument that UMC puts forward to attack Exhibit 2015 is that UMC was allowed to rely on the purchase orders, rather than on the invoice costs. The court has already rejected the argument that purchase orders more accurately state "actual costs incurred" when the entirety of material costs are readily available on invoices. In addition, Exhibit 2015, as is the government's entire fraud case, is derived from

---

**26.** Contrary to UMC's complaint as to the accuracy and efficacy of the exhibit, the government's Exhibit 2015, in a note, specifically explains how the cost figures for the Teledyne engines were formulated based upon invoices:

Actual cost of the Engine was adjusted to eliminate effect of configurations change ($2,488,-514 − 214,914 = $2,273,600). Calculated by

eliminating "Shutdown Relay" at $3.60 and "diode to correct voltage regulator" at $70 from the total configuration change of $92.02 to $87.72 per unit times 2,450 units equals $214,914. These items were eliminated because they were later deleted from the actual part bought. This results in a unit price of $928 for the 2,450 units actually purchased.

820

UMC's representation in the June 11, 1992 claim for increased material costs that its claim was based on "actual increases experienced" and "actual cost records" for the "actual costs" of 2,487 units. Therefore, the government's posture in Exhibit 2015 of capping the quantity of units at 2,487 and limiting costs for only those goods received up to 2,487 units is logical and persuasive in light of the court's earlier determinations.

UMC also cites FAR 31.205–26 to suggest that excess purchases of materials are allowable costs that can be included in the claim in order to account for scrap, shrinkage, and other material losses due to the manufacturing process. *See* 48 C.F.R. § 31.205–26. The problem with this argument is that UMC failed to present any evidence that even suggested that UMC purchased excess quantities for the purposes outlined in FAR 31.205–26. In addition, Mr. Devejian specifically eliminated "overbuys" when calculating invoice costs in 1995 in the memorandum he prepared to reflect UMC's invoice costs, further supporting the government's contention that the acquisition of any excess parts was inadvertent at best and not compensable.

After extensive review of Exhibit 2015, the testimony related to the exhibit and to the matters contained within the record before the court, the court finds that Exhibit 2015 reflects the UMC's "actual costs incurred" as derived from invoices. The court, therefore, finds that the total amount of $195,984.00, reflecting the amount of overstatement between UMC's June 11, 1992 claim and the invoice amount for material costs, is properly stated as the amount of UMC's misrepresentation of "actual costs incurred." The amount of $195,984.00 should be multiplied by the rates for freight (2.6%) and the rate for general and administrative costs (11.15%), which are the same rates UMC applied in their claim for increased material costs on June 11, 1992. The total misrepresentation amounts to $223,500.00, as rounded up to the nearest dollar by UMC in their June 11, 1992 claim.

## CONCLUSION

The court finds, upon careful review of the record, that UMC, the plaintiff and counter-claim defendant in the above-captioned case, is liable under the Special Plea in Fraud, 28 U.S.C. § 2514, the False Claims Act, 31 U.S.C. § 3729, and the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604.

■ Pursuant to the Special Plea in Fraud, 28 U.S.C. § 2514, the court holds that forfeiture of UMC's claim against the United States is warranted. UMC submitted a claim for an equitable adjustment based on cost or pricing data that consistently represented that UMC incurred over $195,984.00 in material costs for which, to this day, no vendor has billed. Nor does UMC present a good faith argument that vendors will eventually invoice for the increased amount or that UMC believes that vendors will eventually invoice the company for these costs.

■ Pursuant to the False Claims Act, 31 U.S.C. § 3729, the court finds that the government is entitled to recover civil penalties, even in the absence of actual damage. *See Rex Trailer Co. v. United States,* 350 U.S. 148, 152–53, 76 S.Ct. 219, 100 L.Ed. 149 (1956); *Commercial Contractors, Inc. v. United States,* 154 F.3d at 1371 (upholding finding of civil penalty under False Claims Act, but reversing finding of treble damages under False Claims Act because there was no evidence of actual damages); *United States v. Dyncorp, Inc.,* 136 F.3d at 681 ("there is authority to the effect that the government need not prove damages to establish liability under the FCA [False Claims Act], but can instead recover statutory penalties for a violation even absent any damages"); *United States v. Rivera,* 55 F.3d 703, 709 (1st Cir.1995) ("Indeed, a contractor who submits a false claim for payment may still be liable under the FCA [False Claims Act] for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss."). The United States is not seeking treble damages under the False Claims Act in the instant counterclaim suit. Instead, the government is seeking one civil penalty in recognition of the fact that UMC's numerous claims in different fora are restatements of the same June 11, 1992 claim, at least insofar as material costs are concerned. The court finds UMC liable

for civil penalties, under the False Claims Act, in the modest amount of $10,000.00.

■■ Pursuant to the antifraud provision of the Contract Disputes Act, 41 U.S.C. § 604, the court holds that UMC is liable to the government for the amount of misrepresentation it presented in the June 11, 1992 claim for equitable adjustment and for the government's cost of review. The misrepresentation is the difference between UMC's claim for increased material costs based on purchase orders and the plaintiff's actual costs based on invoices multiplied by overhead expenses, totaling $223,500.00. This differential is attributable to undelivered parts and unbilled escalation, costs UMC knew it had not incurred and probably never will incur. Plaintiff, therefore, is liable under the Contract Disputes Act for $223,500.00 plus the government's costs of review. The United States shall submit an accounting of its costs of review.

**IT IS SO ORDERED.**